[No. B172588. Second Dist., Div. Four. Dec. 5, 2007.]

OCM PRINCIPAL OPPORTUNITIES FUND, L.P., et al., Plaintiffs and Appellants, v.
CIBC WORLD MARKETS CORP., Defendant and Appellant.
TCW SHARED OPPORTUNITY FUND II, L.P., et al., Plaintiffs and Appellants, v.
CIBC WORLD MARKETS CORP., Defendant and Appellant.

836

COUNSEL

Hennigan, Bennett & Dorman, J. Michael Hennigan, Robert L. Palmer, William B. Stoner, James P. Habel, Michael Swartz, Jeffrey S. Koenig, Allison K. Chock; Greines, Martin, Stein & Richland, Irving H. Greines and Marc J. Poster for Plaintiffs and Appellants.

Mayer, Brown, Rowe & Maw, Donald M. Falk, Neil M. Soltman and Fredrick S. Levin for Defendant and Appellant.

OPINION

MANELLA, J.—Several investment funds initiated actions against CIBC World Markets Corp. (CIBC), alleging misrepresentation and fraud in connection with the issuance and sale of promissory notes. After a jury returned a verdict in favor of the investment funds, the trial court denied prejudgment interest to three of the funds, namely, OCM Principal Opportunities Fund, L.P. (OCM), together with Pacholder Value Opportunity Fund, L.P., and Pacholder Heron, L.P. (collectively, Pacholder). CIBC appeals from the judgment in favor of the investment funds, and OCM and Pacholder cross-appeal from the denial of prejudgment interest. We reverse the denial of prejudgment interest, and otherwise affirm the judgment in favor of the investment funds.

## FACTUAL AND PROCEDURAL BACKGROUND

Renaissance Cosmetics, Inc. (RCI), manufactured and marketed perfumes, colognes, makeup, and related products. In early 1997, CIBC assisted RCI in

raising approximately $200 million through a sale of high-yield promissory notes with a maturity date of February 15, 2004. The sale was conducted under Securities and Exchange Commission (SEC) rule 144A (17 C.F.R. § 230.144A (1997)) (Rule 144A), which permits an entity to sell securities that are not registered under the Securities Act of 1933 (15 U.S.C. § 77a et seq.)—and thus cannot be publicly traded—to enumerated qualified buyers (*In re Livent, Inc. Noteholders Securities Litig.* (S.D.N.Y. 2001) 151 F.Supp.2d 371, 431). Following a well-established practice, RCI sold the unregistered notes, and later exchanged them for substantially identical—but registered—notes that could be publicly traded.[1]

CIBC oversaw the creation of an offering memorandum regarding the unregistered notes, and acted as the "initial purchaser" of the notes. In February 1997, RCI and CIBC issued the offering memorandum, which contained RCI's promise that it would ultimately exchange them for registered notes. CIBC also bought unregistered notes with a face value of $200 million from RCI at a 3 percent discount, and resold these notes to qualified buyers. In May 1997, RCI conducted the promised exchange.

OCM and Pacholder, along with TCW Opportunity Fund II, L.P., TCW Shared Opportunity Fund IIB, L.L.C., TCW Shared Opportunity Fund III, L.P., TCW Leveraged Income Trust, L.P., and TCW Leveraged Income Trust II, L.P. (collectively, TCW), began buying the registered notes in February 1998. General Electric Capital Corporation (GECC), RCI's senior creditor, forced RCI into liquidation in June 1999.

In April 2000, OCM and Pacholder initiated an action against CIBC, asserting claims that CIBC had engaged in fraud, misrepresentation, and violations of federal and state securities laws in connection with RCI's notes. TCW initiated a similar action against RCI for fraud and misrepresentation in May 2001. These actions were later consolidated.

Trial was by jury. At trial, TCW, OCM, and Pacholder asserted three claims for intentional and negligent misrepresentation, and intentional nondisclosure; in addition, OCM and Pacholder asserted two claims for violation of Corporations Code section 25500 and federal securities law. Following the

---

[1] "Rule 144A offerings are often followed by SEC-registered exchange offers . . . where the issuer (usually pursuant to a contractual commitment in the Rule 144A offering documents) offers to holders of the Rule 144A securities to exchange those securities for similar securities which have been registered and, therefore, are freely resalable." (*In re Livent, Inc. Noteholders Securities Litig., supra*, 151 F.Supp.2d at p. 431.) The private placement of unregistered securities, coupled with the promise of a subsequent exchange for registered securities, "is typical of high-yield debt issuance." (*American High-Income Trust v. AlliedSignal* (S.D.N.Y. 2004) 329 F.Supp.2d 534, 541.)

close of the plaintiffs' case-in-chief, the trial court denied CIBC's motions for nonsuit. On September 4, 2003, the jury returned its verdict, concluding that OCM, Pacholder, and TCW had suffered damages as the result of CIBC's negligent misrepresentation and intentional nondisclosure. The trial court subsequently denied OCM and Pacholder's request for prejudgment interest pursuant to Corporations Code section 25500.

On October 15, 2003, the trial court entered a judgment that awarded OCM, Pacholder, and TCW, respectively, $13,412,489, $2,440,504, and $16,249,490 in damages, and later denied CIBC's motions to vacate the judgment and for judgment notwithstanding the verdict (j.n.o.v.).[2] CIBC appealed from the judgment, and OCM and Pacholder cross-appealed from the denial of their request for prejudgment interest under Corporations Code section 25500.

## DISCUSSION

### I.

CIBC contends that (1) its motions for nonsuit and for j.n.o.v. were improperly denied, and (2) the judgment incorporates an impermissible double recovery of damages.[3]

### A. Motions for Nonsuit and J.N.O.V.

CIBC contends that the trial court erred in denying nonsuit and j.n.o.v. because the evidence is insufficient to support the claims for negligent misrepresentation and intentional nondisclosure.

#### 1. Governing Principles

The crux of respondents' fraud claims is that CIBC misrepresented the success of RCI's business strategy and growth plan, and concealed RCI's failed marketing strategy and weak financial condition, as well as sales tactics

---

[2] The judgment indicates that these sums reflect the damages awarded by the jury, with adjustments for funds received in various settlements. On December 23, 2003, the trial court entered an amended judgment modified in a manner not relevant to the appeal and cross-appeal before us.

[3] CIBC's opening brief on appeal characterizes the trial court's rulings on many other matters in unfavorable terms, but it does not present argument (with citation to appropriate legal authorities) that these rulings were erroneous. Accordingly, it has forfeited all such contentions. (Schaeffer Land Trust v. San Jose City Council (1989) 215 Cal.App.3d 612, 619, fn. 2 [263 Cal.Rptr. 813]; Horowitz v. Noble (1978) 79 Cal.App.3d 120, 138–139 [144 Cal.Rptr. 710]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 594, pp. 627–629; id. (2007 supp.) § 594, pp. 193–194.)

RCI used to disguise its poor prospects for survival. Generally, " ' "[t]he elements of fraud, which give[] rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." ' [Citation.]" (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173 [132 Cal.Rptr.2d 490, 65 P.3d 1255].)

■ Claims for negligent misrepresentation and intentional concealment deviate from this set of elements. "The tort of negligent misrepresentation does not require scienter or intent to defraud. [Citation.] It encompasses '[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true' [citation], and '[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true' [citations]." (*Small v. Fritz Companies, Inc.*, supra, 30 Cal.4th at pp. 173–174.) Additionally, to establish fraud through nondisclosure or concealment of facts, it is necessary to show the defendant "was under a legal duty to disclose them." (*Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 735 [29 Cal.Rptr. 201].)

Rulings on motions for nonsuit and for j.n.o.v. are reviewed for the existence of substantial evidence. (*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1580 [47 Cal.Rptr.2d 752] [nonsuit]; *Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 703 [38 Cal.Rptr.2d 413] [j.n.o.v.].) Although the trial court addressed different bodies of evidence in issuing these rulings, we examine the entire record for substantial evidence to support them. Whereas the body of evidence pertinent to nonsuit is that identified in the plaintiff's opening statement or case-in-chief (7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 416, p. 477), the entire body of evidence presented at trial is pertinent to a j.n.o.v. motion. (*Pusateri v. E. F. Hutton & Co.* (1986) 180 Cal.App.3d 247, 250 [225 Cal.Rptr. 526].) However, "an order denying nonsuit will not be disturbed on appeal despite justification of nonsuit by evidence presented at close of [the] plaintiff's case, if the evidence subsequently introduced by [the] defendant 'cures' the missing element." (*Housley v. City of Poway* (1993) 20 Cal.App.4th 801, 814 [24 Cal.Rptr.2d 554].)

Substantial evidence is not " 'synonymous with "any" evidence. It must be reasonable . . . , credible, and of solid value . . . .' [Citation.]" (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 [29 Cal.Rptr.2d 191].) However, "the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination [of the trier of fact], and when two or more inferences can

reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the [trier of fact]." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874 [197 Cal.Rptr. 925], italics omitted.)

As we elaborate below (see pt. I.A.2., *post*), respondents' theory at trial was that in late 1996, CIBC decided to terminate its role as RCI's creditor. To this end, CIBC conducted a Rule 144A transaction with RCI in early 1997 which permitted RCI to repay CIBC's loans through funds obtained from the sale of the unregistered notes. In arranging the transaction, CIBC determined that RCI had experienced poor holiday sales in 1996 and that its marketing strategy was failing. As the initial purchaser of the unregistered notes, CIBC prepared a misleading offering memorandum, knowing that if it disclosed RCI's poor holiday sales and unsuccessful business strategy, the sale of the unregistered notes and subsequent sale of the registered notes would collapse. CIBC reviewed RCI's registration statement, which triggered the exchange of the unregistered notes for the registered notes, and which reaffirmed many of CIBC's misrepresentations. CIBC then repeated its favorable characterization of RCI in investment opinions intended to guide buyers of the registered notes. Respondents relied on CIBC's misrepresentations in buying the registered notes, and ultimately lost their entire investment in them.

### 2. Evidence at Trial[4]

#### a. RCI

In 1994, Thomas Bonoma participated in the founding of RCI and served as its chairman, chief executive officer, and president. RCI's business strategy was to acquire the rights to familiar fragrance products such as Chantilly, Tabu, and English Leather, and reinvigorate their presence in the market through a variety of techniques. RCI also created new products it called "focused flankers," which were associated with its familiar products but were aimed at other segments of the market.

RCI effectively sold its products to retailers on consignment. It permitted its retailers to return unsold product for full credit, and paid for the return shipping. Nonetheless, accounting rules permitted RCI to "book" sales to retailers upon shipment, provided it maintained reserves based on a reasonable estimate of returns.

The market for RCI's products was highly seasonal. Over half of all sales typically occurred during the year-end holiday season from October to December, and a relatively minor surge in sales occurred before Mother's Day. RCI

---

[4] Following established principles of appellate review, we summarize the evidence at trial in the light most favorable to the judgment. (*Buehler v. Sbardellati* (1995) 34 Cal.App.4th 1527, 1531, fn. 1 [41 Cal.Rptr.2d 104].)

tracked the retail sales of its products by means of data from Information Resources, Inc. (IRI), an independent market research firm. IRI data for a given sales period was available to RCI through an online electronic system 24 to 30 days after the end of the period.

### b. *RCI's Dealings with CIBC*

In April 1996, RCI projected that sales of its products in the 1996 fiscal year—which ended March 31, 1997—would increase, but it needed loans to finance its acquisitions and expand its operations. CIBC, which is engaged in investment banking, assisted RCI in obtaining financing. Mark Dalton was the CIBC employee responsible for its transactions with RCI.

CIBC first arranged for a loan of $20 million, which was repaid through the sale of RCI preferred stock, in which CIBC participated. At the closing dinner for this sale, which occurred in September or October 1996, Bonoma distributed to Dalton and other CIBC employees a document entitled "The Weasel Parade." This document disparaged RCI and other participants in the transaction, and characterized the "morals involved" in it as "giv[ing] crooks, sophisters and Nazis something to aspire to, if one aspires to a lower circle of Hell as much as a higher."[5]

In November 1996, CIBC provided a bridge loan of $117.5 million for RCI, on the condition that RCI would refinance the loan by issuing the notes that are the subject of the underlying litigation. According to Jeremy Back, a CIBC employee who participated in the preparation of the offering memorandum, RCI's sale of the unregistered notes was arranged at CIBC's insistence to ensure repayment of the bridge loan, to end CIBC's exposure to risk as RCI's creditor, and to earn CIBC a fee for the sale. CIBC controlled the issuance of the unregistered notes. In addition to overseeing the preparation of the offering memorandum regarding the unregistered notes and functioning as the "initial purchaser" of the notes, CIBC organized a "road show," that is, meetings by RCI executives with potential buyers of the notes.

### c. *CIBC's Conduct Regarding the Offering Memorandum*

Sales of RCI's products during the 1996 Christmas season—that is, the third quarter of its 1996 fiscal year—were weaker than RCI had projected. Shawn Bookin, a senior vice-president and investment analyst at TCW, opined that if RCI had disclosed this fact prior to the sale of the unregistered

---

[5] In admitting this document and a second "Weasel Parade" document described *post*, the trial court instructed the jury that the documents were not to be considered for the truth of the matters asserted, but solely "as to what [CIBC] may have known, as to when [CIBC] may have known [it], and [as to] whether [CIBC] should have disclosed the information."

notes, the sale would have failed. RCI responded to the weak Christmas season by "stuffing the channel," that is, stuffing retailers with its products knowing that a large amount would be returned unsold. This tactic permitted RCI to boost its sales and revenue figures for the 1996 fiscal year, but was likely to drain its cash reserves in the long term. In addition, the tactic was likely to injure the public's view of RCI's products when the returned products were ultimately sold in discount stores.

In a report dated January 27, 1997, IRI confirmed to RCI that sales of its products by retailers had been weak in the 1996 Christmas season. Although retail sales of RCI's fragrance products for men had increased during that period, sales of its fragrance products for women had decreased by 2 percent, contrary to RCI's expectations for the 1996 fiscal year. The report also indicated that the market for perfumes and colognes had diminished during the 1996 Christmas season: industrywide sales of women's and men's fragrances had decreased, respectively, 13 percent and 9 percent.

A key issue at trial was the extent to which CIBC knew about RCI's poor Christmas season sales during the preparation of the offering memorandum, which was issued in early February 1997. According to Jeremy Back, CIBC could obtain IRI data about RCI's sales upon request to RCI. Dalton provided conflicting testimony about whether CIBC knew about this data. At trial, he denied that CIBC knew that RCI had IRI data regarding the 1996 Christmas season. However, during his deposition, he stated that CIBC was aware of the IRI data, but declined to examine it. He stated: "We could either spend the month of December looking at IRI data or putting together an offering memorandum and a road show presentation with information that investors would find relevant. We chose to do the latter." Back and Dalton also testified that while CIBC prepared the offering memorandum and sold the unregistered notes, they never saw the January 1997 IRI report.

The evidence at trial nonetheless indicated that as early as December 1996, Dalton knew about RCI's weak performance in the third quarter of the 1996 fiscal year. In a memorandum dated December 10, 1996, Dalton provided advice to a CIBC superior who was scheduled to meet with Bonoma. Dalton's memorandum identified questions Bonoma might ask at the meeting, and supplied responses to these questions. If Bonoma were to ask, "Should I wait 'til the end of my fiscal year (3/31) to refinance?," Dalton advised the following answer: "If you believe that your fourth quarter will be great, we can sell through the *poor third quarter*. The risk is waiting for the fourth quarter, missing the numbers and being unable to refinance in May, or that the market goes away." (Italics added.)

A second key issue at trial concerned whether CIBC knew, or should have known, that the financial data in the offering memorandum reflected RCI's

"channel stuffing." In preparing the offering memorandum, CIBC used a forecast RCI provided for the 1996 fiscal year, which predicted RCI's total net sales—that is, its sales after returns—and earnings before interest, taxes, depreciation, and amortization (EBITDA), a measure of cash flow that reflects an entity's ability to support debt. The forecast contained detailed financial estimates for each month of the 1996 fiscal year, and projected total net sales of $198,895,000 and EBITDA amounting to $22,536,000. The forecast supported these estimates by predicting that RCI would achieve higher net sales and EBITDA in the final quarter than in the third quarter.[6] This prediction relied on RCI's estimated performance in March 1997, for which the forecast projected the highest net sales and the second highest EBITDA of any month in the 1996 fiscal year.[7]

The evidence at trial indicated that Dalton knew RCI's forecast was suspect and deserved special scrutiny. In a memorandum dated January 7, 1997, Dalton addressed the estimates in the forecast, noted that the sales and revenue RCI projected for the fourth quarter of the 1996 fiscal year—especially for March 1997—were "highly aggressive," and stated: "I think that we should ask Tom Bonoma point-blank if these numbers are padded with squirrelly sales assumptions, and, if so, make him lower the projections . . . ."

Dalton provided conflicting testimony at trial about the January 7, 1997 memorandum. He initially testified that after writing this memorandum, he talked to Bonoma, who reduced the forecast's estimates for the final quarter of the 1996 fiscal year, and that these *reduced* estimates were incorporated in CIBC's offering memorandum. This testimony was contrary to the offering memorandum itself, which incorporated the forecast's estimates. Dalton later testified that before January 7, 1997, he challenged Bonoma's then current projections for the fourth quarter of RCI's 1996 fiscal year and persuaded Bonoma to reduce them. Bonoma then offered CIBC the estimates found in RCI's forecast, which were lower than Bonoma's previous projections. According to Dalton, after he questioned Bonoma's revised estimates in his January 7, 1997 memorandum, Bonoma vouched for their validity, and CIBC relied on them in preparing the offering memorandum.

---

[6] For the third quarter, the forecast projected net sales of $54,748,000 and EBITDA amounting to $4,215,000; for the final quarter, it projected net sales of $66,437,000 and EBITDA amounting to $8,410,000.

[7] The forecast projected net sales of $32,438,000 and EBITDA amounting to $5,225,000 for March 1997.

#### d. *The Offering Memorandum*

CIBC's offering memorandum dated February 3, 1997, contained lengthy descriptions of RCI's business strategy and financial status. The memorandum stated: "In developing new products, [RCI] seeks to build on its growing brand values, expanding customer base, increasing allocation of retail shelf space and point-of-sale consumer access." It asserted that RCI used IRI data and electronic information systems to track and regulate sales, and to "provide sophisticated inventory management and distribution capabilities." According to the offering memorandum, RCI's employment of "state-of-the-art mathematical modeling tools to understand the sales dynamics of categories [and] brands" facilitated "strategic partnering with retailers," and thereby "strengthen[ed] its overall relationship with retailers." The offering memorandum asserted that "[s]ince inception, management believes that it has successfully reestablished trust and a reputation for reliability with [retailers] resulting from [RCI's] reinvigoration of previously underperforming fragrances and the successful launch of focused flankers."

Regarding the focused flankers, the offering memorandum further stated: "[RCI's] new products . . . draw on the consumer recognition and heritage of [RCI's] existing brand equities while simultaneously enhancing and revitalizing the 'parent' products being flanked. . . . To date, [RCI] has successfully launched White Chantilly as a flanker of the classic Chantilly brand in the fall of 1995, DREAMS BY TABU as a flanker of the classic TABU brand in February 1996 and Navigator from Canoe as a flanker of the classic Canoe brand in September 1996." (Italics omitted.)

The offering memorandum also provided financial data for RCI's 1995 fiscal year and a projection for its 1996 fiscal year. Although this projection omitted the month-by-month financial analyses found in the forecast that RCI had provided to CIBC, it repeated the forecast's estimates for total sales and revenue, which rested on the predictions for the final quarter that Dalton had characterized in January 1997 as "highly aggressive." The offering memorandum estimated that RCI's total net sales for the 1996 fiscal year would be $198,895,000, thus exceeding its total net sales in the 1995 fiscal year. It also projected an increase in RCI's EBITDA from $16,501,000 in the 1995 fiscal year to $22,536,000 in the 1996 fiscal year.

#### e. *Sale and Exchange of the Unregistered Notes*

CIBC conducted the sale of the unregistered notes in early February 1997, and thereafter engaged in no new transactions with RCI. CIBC nonetheless continued to act as RCI's financial advisor, and Mark Dalton attended RCI board meetings. In April 1997, at the closing dinner regarding the sale of the

unregistered notes, Bonoma distributed to CIBC employees a document entitled "The Weasel Parade News." This document disparaged both RCI and CIBC. Regarding RCI, it stated, "I [Bonoma] did my song and dance, which can be called '*Improved Lying and Cheating*' when this and last year's prospectuses are compared," and added that Bonoma's biography in the offering memorandum should have asserted: "Thomas V. Bonoma: paroled, cannot leave state, ankle bracelet." It stated, "Nobody challenges [RCI's chief financial officer] on the company's numbers because nobody understands the company's numbers," and characterized what CIBC called a "pro forma" as a "fiction of a fiction."

On May 8, 1997, RCI issued the registration statement—also known as a prospectus or "S4"—regarding the registered notes. It closely resembled the offering memorandum, but contained a modified description of RCI's financial performance. The registration statement described RCI's business strategy and products in terms materially similar to the offering memorandum. Unlike the offering memorandum, it omitted a projection or description of RCI's financial performance for the full 1996 fiscal year, but nonetheless indicated that RCI's net sales and EBITDA for the first three quarters of the 1996 fiscal year exceeded its net sales and EBITDA for the corresponding period of the 1995 fiscal year. In May 1997, RCI filed the registration statement with the SEC and conducted the exchange.

### f. *CIBC's Initial Recommendations Regarding the Registered Notes*

Bonoma died of a heart condition on May 21, 1997. On May 23, 1997, CIBC issued an investment opinion regarding the registered notes, recommending "Buy." The opinion asserted that the registered notes were undervalued and "an attractive buying opportunity," recited financial data showing steady growth in RCI's EBITDA, and reaffirmed the offering memorandum's estimates regarding RCI's EBITDA for the 1996 fiscal year. It acknowledged Bonoma's death, but stated that RCI "continues to demonstrate its ability to reinvigorate established brand names."

In late June and early July 1997, RCI acknowledged in SEC filings and elsewhere that its actual net sales and EBITDA for the 1996 fiscal year were, respectively, $174,612,000, and $19,233,000, and that it had not achieved the sales and earnings projected in the offering memorandum. In an internal CIBC memorandum dated July 10, 1997, Mark Dalton stated that although RCI had missed its predicted sales and earnings, it claimed that its actual net sales and EBITDA for the final quarter of the 1996 fiscal year had exceeded

its actual net sales and EBITDA for the third quarter.[8] In large measure, RCI attributed its failure to meet the predictions for the 1996 fiscal year to an accounting error in the third quarter, which had led RCI's management, in projecting its performance for the final quarter, to overestimate its likely sales and earnings.

In a second investment opinion dated August 15, 1997, CIBC again recommended "Buy," and predicted an increase in RCI's sales and EBITDA. It estimated that RCI's EBITDA for the 1997 fiscal year would exceed its EBITDA for the 1996 fiscal year. Noting that "the overall domestic fragrance market [was] underperforming," CIBC asserted that RCI was "poised to combat the trend through new product introductions and revitalized promotional campaigns," including the launching of new flankers.

On September 18, 1997, CIBC issued a lengthy investment opinion recommending "Buy." The opinion stated: "Management's impressive track record in reinvigorating several mass market fragrance brands . . . bodes well for the prospect of repeating these successes with several recently-purchased brands . . . ." In addition, it asserted that RCI had successfully introduced three flanker brands, including DREAMS BY TABU and Navigator. The opinion recited financial data indicating that RCI's sales and EBITDA had increased from the 1995 fiscal year to the 1996 fiscal year, and concluded that RCI "has proven that its strategy works."

### g. OCM, Pacholder, and TCW

OCM, Pacholder, and TCW are investment funds that seek out fundamentally sound companies in financial distress. Their business strategy is to buy up the debt of these companies at a discount and later exchange it for stock during bankruptcy proceedings, thereby freeing the companies from debt payments while acquiring an ownership interest in them.[9] This strategy assumes that the market for notes is not perfectly efficient; in some cases, the market value of a note or bond issued by a company in financial distress may be too low, given the company's underlying strength. Bruce Karsh, OCM's president, testified: "[O]ur whole goal and the intent is to buy a bond at 50, participate in the reorganization proceeding, and get new stock, let's say, that might be valued at 70. It's on the dollar, and that's how we make our profit."

---

[8] According to RCI, its actual net sales and EBITDA for the third quarter were, respectively, $46,880,000 and $4,224,000, and its actual net sales and EBITDA for the final quarter were, respectively, $50,022,000 and $5,078,000.

[9] Within the investment industry, funds that pursue this strategy are sometimes called "vulture funds." During the underlying trial, the court barred the use of this term to describe OCM, Pacholder, and TCW.

On February 3, 1998, RCI announced that its sales for the 1997 Christmas season were lower than expected, resulting in serious losses, that is, negative EBITDA between $14 million and $16 million. RCI attributed its low sales and revenue primarily to a fundamental change in its "business environment," stating that the 1997 Christmas season was "the second holiday season in a row in which the mass market fragrance industry underperformed relative to industry expectations." It warned that it might be unable to pay a scheduled interest payment due on the registered notes, but nonetheless expressed confidence in its long-term business strategy.

Following this announcement, the market value of the registered notes fell to approximately half their initial price. OCM, Pacholder, and TCW began buying the notes in response to this drop in price. Their business strategy required them to make a careful analysis of the company's strengths and weaknesses, as well as its ability to survive. Thus, in deciding whether to buy the registered notes, they examined the offering memorandum, the registration statement, and CIBC's investment opinions. They concluded that RCI's products were assets with substantial value, given the representations in the offering memorandum and registration statement that RCI had successfully reinvigorated established products and launched "focused flankers," and that it exercised sound control over its sales to retailers.

In an investment opinion dated February 3, 1998, CIBC warned that RCI's earning capacity was difficult to assess, but estimated that its annual EBITDA could be as high as $25 million "with operational fixes." On the assumption that RCI would be reorganized or sold through a bankruptcy, CIBC estimated the then present value of the notes at between 38.3 percent and 85 percent of their face value. In an analysis dated February 6, 1998, CIBC recommended "Hold" regarding the registered notes, and reaffirmed the estimates of the prior investment opinion (with minor modifications). CIBC indicated that RCI's meager EBITDA for the 1997 fiscal year was due to undescribed "prior-year events." On February 20, 1998, a CIBC analysis again recommended "Hold," attributed RCI's difficulties to "a very difficult year in the industry," and estimated that its EBITDA for the 1998 fiscal year would be approximately $19.3 million.

From February to July 1998, OCM, Pacholder, and TCW bought approximately $53.8 million worth of the registered notes, whose market value decreased throughout this period. In late June 1998, they began to discuss with RCI a reorganization through bankruptcy. In August 1998, they learned that RCI had no cash to continue its operations, and that GECC, RCI's senior secured creditor, intended to liquidate RCI. On August 26, 1998, OCM, Pacholder, and TCW loaned RCI $2 million to forestall liquidation, hoping to preserve their investment in the registered notes by funding RCI's 1998

Christmas season. They persuaded GECC to give this loan priority in bankruptcy proceedings equivalent to GECC's loan. In making the loan, they also signed a confidentiality agreement permitting them to examine RCI's finances, and learned that RCI "was in a complete meltdown," "worthless," and "a total mess." RCI's warehouses were full of returned inventory from previous Christmas seasons, and its accounts and computer systems were in chaos. GECC liquidated RCI in June 1999.

### 3. *Absence of Affirmative Misrepresentation*

■ CIBC contends that respondents' claim for negligent misrepresentation fails for want of an affirmative misrepresentation. Generally, "[p]arties cannot read something into a neutral statement in order to justify a claim for negligent misrepresentation. The tort requires a 'positive assertion[.]' [Citation.] 'An "implied" assertion or representation is not enough. [Citations.]' [Citations.]" (*Diediker v. Peelle Financial Corp.* (1997) 60 Cal.App.4th 288, 297–298 [70 Cal.Rptr.2d 442].)

■ A single material misrepresentation may establish the tort. (*Oakes v. McCarthy Co.* (1968) 267 Cal.App.2d 231, 261 [73 Cal.Rptr. 127].) Moreover, as our Supreme Court explained in *Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1081–1084 [60 Cal.Rptr.2d 263, 929 P.2d 582], when the defendant purports to convey the "whole truth" about a subject, " 'misleading half-truths' " about the subject may constitute positive assertions for the purpose of negligent misrepresentation. Thus, in *Randi W.*, the court held that letters of recommendation for an instructor that extolled his rapport with students and urged his employment but omitted reference to complaints about his improper contact with female students amounted to "false and misleading" representations. (*Id.* at p. 1084.)

Similarly, in *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104, 106–108 [128 Cal.Rptr. 901], a partnership sought a loan, and a law firm connected with the partnership provided the lender with an opinion letter about the nature of the partnership. The letter opined that the partnership consisted solely of general partners, but did not mention that most members believed they were in a limited partnership with a single general partner; it thus did not address whether this widespread belief affected the status of the partnership. (*Ibid.*) The lender subsequently asserted a claim of negligent misrepresentation against the law firm. (*Id.* at pp. 106–107.) On appeal, the law firm challenged this claim, arguing that the lender had failed to identify an affirmative falsehood in the letter. (*Id.* at p. 111.) The court rejected this contention. (*Ibid.*) Because the lender had relied on the letter for guidance about the partnership's status, the court concluded that the letter's description of the partnership was a half-truth "as misleading as outright falsehood." (*Ibid.*)

 Here, the offering memorandum is replete with representations about the established success of RCI's business strategy, including the "reinvigoration of previously underperforming fragrances and the successful launch of focused flankers," the soundness of its relationship with retailers, its ability to track sales accurately, and the likelihood of a strong performance throughout the 1996 fiscal year. Furthermore, there was testimony from respondents and Jeremy Back, the CIBC employee who helped prepare the offering memorandum, that investors would have expected CIBC to try to avoid material omissions in the offering memorandum. Because the offering memorandum omits any reference to RCI's poor third quarter and the channel stuffing that inflated its financial estimates for the 1996 fiscal year but degraded its ultimate prospect for survival, the offering memorandum contained half-truths "as misleading as outright falsehood" (*Roberts v. Ball, Hunt, Hart, Brown & Baerwitz, supra,* 57 Cal.App.3d at p. 111).[10] The same conclusion must be drawn about the registration statement and investment opinions, which repeat many of the representations in the offering memorandum.

CIBC suggests that the offering memorandum did not contain half-truths because there is insufficient evidence that RCI engaged in channel stuffing. It points to RCI's admission in mid-1997 that it had not achieved the sales and earnings predicted for the 1996 fiscal year in the offering memorandum. Notwithstanding the admission, however, RCI asserted that its actual sales and earnings in the final quarter of the 1996 fiscal year had *exceeded* its actual sales and earnings for the third quarter. In view of RCI's poor sales in the third quarter of the 1996 fiscal year and the discovery of large amounts of returned inventory from previous holiday seasons in RCI's warehouses in August 1998, it is reasonable to conclude that RCI achieved its claimed performance during the fourth quarter of the 1996 fiscal year through channel stuffing.[11]

---

[10] CIBC's reply brief argues at length that the offering memorandum's representations about RCI's business strategy were hedged with qualifications that rendered any prediction of continued success a matter of mere belief, prediction, or opinion. In our view, these qualifications themselves constitute half-truths, in view of CIBC's awareness of RCI's "poor third quarter" for the 1996 fiscal year and RCI's "padded" numbers and "squirrelly sales assumptions" for the fourth quarter of the 1997 fiscal year.

[11] On a related matter, CIBC contends that the offering memorandum and investment opinions conclusively belie respondents' theory that as a historical matter, the lion's share of RCI's profits was generated in the third quarter of its fiscal year, and hence RCI's unusually high sales and earnings for the fourth quarter of fiscal year 1996 (which ended March 1997) was evidence of channel stuffing. It points to the offering memorandum and the August 1997 investment opinion, which indicate that the bulk of RCI's sales occurred in the final two quarters of the fiscal year. We are not persuaded. The offering memorandum also asserts that "[s]ales of fragrances are highly seasonal at retail, with *over one-half of the mass-market fragrance industry's sales occurring during the calendar year-end holiday season from October to December.*" (Italics added.)

### 4. Limitation on Liability

CIBC contends that it cannot be liable to respondents on a theory of negligent misrepresentation because it did not intend the offering memorandum to influence their purchase of the registered notes. In *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 408–415 [11 Cal.Rptr.2d 51, 834 P.2d 745], our Supreme Court held that an auditor who plays a "secondary" role in the preparation of a financial report for a client—that is, who relies entirely on information provided by its client—is liable only to a limited class of third parties for negligent representations contained in the financial report, viz., the class delimited in section 552, subdivision (2), of the Restatement Second of Torts (section 552(2)). CIBC argues that it held a position akin to that of an auditor in preparing the offering memorandum, and thus it is not liable to respondents, who purportedly fall outside the class defined in section 552(2).

■ Section 552(2) places a special limitation on negligent misrepresentation claims against professionals such as auditors, attorneys, architects, engineers, and title insurers, who generally provide opinions to clients on the basis of information supplied by the clients. (*Bily v. Arthur Young & Co., supra,* 3 Cal.4th at pp. 399–402, 410; see Rest.2d Torts, § 552, com. h, p. 132.) Section 552(2) provides that the liability of such parties is limited to the "loss suffered [¶] (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and [¶] (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction." This limitation extends "liability only to those persons for whose benefit and guidance it is supplied," as "distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance on it." (Rest.2d Torts, § 552, com. h, pp. 132–133.) The limitation restricts the liability of "the maker of the representation" to "a particular person or persons, known to him, or a group or class of persons" the maker intends the representation "to reach and influence."[12] (Rest.2d Torts, § 552, com. h, at pp. 132–133.)

---

[12] Comment h to section 552 elaborates: "Under this Section . . . it is not necessary that the maker should have any particular person in mind as the intended, or even the probable, recipient of the information. In other words, it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it. It is enough, likewise, that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons or group. It is sufficient, in other words, insofar as the plaintiff's *identity is concerned, that the maker supplies the information for repetition to a certain group*

CIBC contends that as a matter of law, the limitation in section 552(2) precludes liability to respondents for misrepresentations in the offering memorandum, arguing that respondents bought registered securities well after CIBC ended its participation in RCI's issuance of securities. We disagree. For the reasons explained below, CIBC placed itself outside the class of professionals and other parties eligible for protection under the limitation.

As we elaborate below (see pt. I.A.6, *post*), the evidence at trial established that when CIBC prepared the offering memorandum it was aware of IRI sales data reflecting a poor third quarter of RCI's 1996 fiscal year. Because CIBC had access to reliable nonpublic information from a third party that disconfirmed RCI's financial forecast, CIBC cannot be viewed as playing only a "secondary role" in preparing the offering memorandum, and thus is not exempt from liability under section 552(2). (See *Nutmeg Securities, Ltd. v. McGladrey & Pullen* (2001) 92 Cal.App.4th 1435, 1443–1444 [112 Cal.Rptr.2d 657] [outside accountant who helps client create financial documents subsequently reviewed in audit does not play secondary role for purposes of § 552(2)].)

In addition, the evidence at trial disclosed (1) that CIBC knew RCI was likely to employ the offering memorandum as a basis for the registration statement and the initial distribution of the registered securities; (2) that CIBC reviewed the registration statement prepared and filed by RCI; and (3) that CIBC, in its investment opinions, reaffirmed some of the misrepresentations in the offering memorandum and registration statement. CIBC's agreement with RCI obliged RCI to seek the registration rights described in the offering memorandum. Prior to the filing of the registration statement, RCI sent CIBC a copy of the draft statement, which was reviewed by a CIBC attorney. Up until February 1998, when appellants began buying the registered securities, CIBC's investment opinions repeated the half-truths in the offering memorandum about RCI's demonstrated ability to revive stale brands, and indicated that RCI had underlying financial strength.

In view of CIBC's awareness that the offering memorandum constituted the basis for the registration statement, section 552(2) does not shield CIBC from liability to buyers of the registered securities who relied directly on the misrepresentations in the registration statement. (See *Murphy v. BDO Seidman* (2003) 113 Cal.App.4th 687, 702–703 [6 Cal.Rptr.3d 770].) However, no California case has addressed whether CIBC is liable to the broader class of

or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given. It is not enough that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated." (Rest.2d Torts, § 552, com. h, pp. 132–133.)

persons who, like appellants, bought the registered securities well after the registration statement had been filed.

■ We find guidance on this issue in *Bowers v. Allied Inv. Corp.* (D.Me. 1993) 822 F.Supp. 835. There, a group of investors asserted a claim for negligent misrepresentation, alleging that an accounting firm misrepresented a corporation's inventory while conducting an audit, and then knowingly allowed the investors to rely on the audit when they decided to buy the corporation's securities. (*Id.* at pp. 839–840.) The accounting firm contended that section 552(2) shielded it from liability because there was no allegation that when it prepared the audit, the firm knew the investors might consult it. The court in *Bowers* rejected this contention, reasoning that although section 552(2) "seeks to allow professionals to retain some control over their liability exposure *at the time* they actually perform their services, professionals can not invoke the Restatement's limitations on liability if they allow third parties to use their work after performing the actual service." (*Bowers v. Allied Inv. Corp., supra,* 822 F.Supp. at p. 840.)

This rationale encompasses the situation before us: CIBC may not invoke section 552(2) after repeating its misrepresentations in the investment opinions, thereby inviting investors to consult—and place reliance upon—the offering memorandum and registration statement. In our view, CIBC placed itself outside the class of persons protected under section 552(2) by playing an active advisory role in the market for the registered notes before and at the time respondents bought them.

CIBC argues that disclaimers in the offering memorandum and the investment opinions establish that CIBC lacked the intent to influence appellants and similarly situated investors. The offering memorandum states that it had been prepared "solely for use" in the sale of the unregistered securities; in addition, each investment opinion states that it is not an offer to buy or sell securities, "reflects judgments as of [the date of issuance,] and is subject to change." In our view, these disclaimers do not obviate liability. As we elaborate below (see pt. I.A.7.b.ii., *post*), the efficacy of disclaimers is assessed by reference to their context and specificity. (See *E. H. Morrill Co. v. State of California* (1967) 65 Cal.2d 787, 793 [56 Cal.Rptr. 479, 423 P.2d 551]; *Murphy v. BDO Seidman, supra,* 113 Cal.App.4th 687, 702–703.) Here, CIBC reviewed the registration statement, which repeated the misrepresentations in the offering memorandum; moreover, the misrepresentations in the investment opinions were false when made, and thus they fall outside the disclaimers in the opinion, which warned only that the opinions had limited temporal validity. (See *Murphy v. BDO Seidman, supra,* 113 Cal.App.4th at pp. 703–704.)

### 5. Duty to Disclose

CIBC contends that respondents' claim for intentional nondisclosure fails because CIBC had no duty to respondents to disclose the full facts about RCI, including the poor sales during the 1996 Christmas season and RCI's dubious tactics to conceal this market failure. CIBC is mistaken.

"There are 'four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts. [Citation.]' " (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 336 [60 Cal.Rptr.2d 539], quoting *Heliotis v. Schuman* (1986) 181 Cal.App.3d 646, 651 [226 Cal.Rptr. 509].) Where, as here, there is no fiduciary relationship, the duty to disclose generally presupposes a relationship grounded in "some sort of *transaction* between the parties. [Citations.] Thus, a duty to disclose may arise from the relationship between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement. [Citation.]" (*LiMandri*, at p. 337, fn. omitted.)

Here, CIBC acted as the initial purchaser of the unregistered notes, which it sold to qualified buyers; the unregistered notes were subsequently exchanged for—or transformed into—registered notes that were traded on the open market and eventually purchased by respondents. Under California law, a vendor has a duty to disclose material facts not only to immediate purchasers, but also to *subsequent purchasers* when the vendor has reason to expect that the item will be resold. (*Geernaert v. Mitchell* (1995) 31 Cal.App.4th 601, 605–609 [37 Cal.Rptr.2d 483]; *Barnhouse v. City of Pinole* (1982) 133 Cal.App.3d 171, 191–193 [183 Cal.Rptr. 881] (*Barnhouse*).)

Thus, in *Barnhouse*, a developer concealed deficient soil conditions in a housing tract, and several homeowners—including some who had bought their houses from the original purchasers—initiated an action for intentional fraud by omission against the developer. The court rejected the developer's contention that its liability was limited to the initial purchasers, observing that the developer had reason to expect that "in a development of relatively inexpensive suburban tract homes, some would change hands." (*Barnhouse*, *supra*, 133 Cal.App.3d at pp. 191–192.) It reasoned: "While an affirmative misrepresentation might not be repeated [citation], a nondisclosure must necessarily be passed on. . . . Under these circumstances it would be anomalous if liability for damages resulting from fraudulent concealment were to vanish simply because of the fortuitous event of an intervening

resale. Ultimately in such a case it is the subsequent purchaser who is directly damaged by the initial nondisclosure. [Citation.] The original purchaser neither suffers damage nor has knowledge to disclose." (*Id.* at p. 192.)[13]

In our view, CIBC is subject to liability under the principle explained in *Barnhouse*. The record establishes that the unregistered notes, as sold by CIBC, were essentially identical to the registered notes, with the exception that they were not (yet) saleable on the open market. Geoffrey Liebmann, an attorney employed by CIBC when it sold the unregistered notes, testified that both kinds of notes carried the same interest rate and due date, and differed only in their marketability.[14] Because CIBC sold the unregistered notes knowing that they would—in effect—become saleable, it had reason to expect that the notes would pass into the hands of subsequent purchasers; moreover, it actively advised potential purchasers regarding the registered notes. Accordingly, CIBC had a duty to disclose RCI's circumstances to potential purchasers, including respondents.

CIBC argues that it had no duty of disclosure toward respondents because it sold unregistered notes in a private transaction with qualified buyers, whereas respondents bought registered notes in a public market. The crux of CIBC's argument is that Rule 144A and certain state regulations regarding Rule 144A displace California common law on this point. We are not persuaded.

Although no court has addressed CIBC's contention regarding Rule 144A, federal case authority indicates that an initial purchaser's immunity from liability is limited. Under Rule 144A, an initial purchaser is "deemed not to be engaged in a distribution of [public securities] and therefore not to be an underwriter of such securities." (17 C.F.R. § 230.144A(b) (2007).) The initial purchaser in a Rule 144A transaction is thus exempt from liability under various provisions of federal law when the initial purchaser limits its role to (1) preparing the offering memorandum and (2) distributing the unregistered security in a private offering to qualified purchasers. (*American High-Income Trust v. AlliedSignal, supra,* 329 F.Supp.2d at pp. 541–542; *In re Enron Corp. Sec., Deriv. & "ERISA" Lit.* (S.D.Tex. 2004) 310 F.Supp.2d 819,

---

[13] In so concluding, the court placed special reliance on section 533 of the Restatement Second of Torts, which states: "The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved."

[14] According to Liebmann, the initial qualified buyers received a physical document embodying the unregistered note; when RCI completed the registration process, the qualified buyers transferred their interests to electronic trading accounts, which contained the information regarding the saleable registered notes.

860–866; *In re Hayes Lemmerz Intern., Inc.* (E.D.Mich. 2003) 271 F.Supp.2d 1007, 1028–1029; *In re Safety-Kleen Corp.* (D.S.C. Mar. 27, 2002) 2002 WL 32349819, at pp. *1–*3; *In re Livent, Inc. Noteholders Securities Litig., supra,* 151 F.Supp.2d at p. 432.)

 Nonetheless, Rule 144A does not preclude fraud claims under Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.) rule 10b-5 (17 C.F.R. § 240.10b-5 (2007)) (Rule 10b-5) against initial purchasers who make misrepresentations in the offering memorandum and actively promote the sale of the pertinent unregistered securities. (*Gabriel Capital, L.P. v. Natwest Finance, Inc.* (S.D.N.Y. 2000) 94 F.Supp.2d 491, 503 (*Gabriel Capital*).) Rule 10b-5 is violated when corporate "insiders" privy to information material to the sale of corporate securities fail to disclose the information for deceptive or manipulative purposes. (*In re Enron Corp. Sec., Derivative & ERISA Lit.* (S.D.Tex. 2003) 258 F.Supp.2d 576, 589–590.) Outside parties— including initial purchasers—share this duty to disclose when they are aware of the information and participate in the sale. (*Gabriel Capital, supra,* 94 F.Supp.2d at p. 503.) Accordingly, Rule 144A does not protect CIBC from liability for intentional nondisclosures to the purchasers of the registered notes, including respondents.

The state regulations in question (Cal. Code Regs., tit. 10, §§ 260.102.15, 260.105.13.1) recognize Rule 144A transactions and exempt initial purchasers from statutory registration requirements regarding securities transactions (Corp. Code, §§ 25102, subd. (f), 25110, 25111, 25130), but do not otherwise address or limit an initial purchaser's liability for fraud.[15] They therefore do not limit CIBC's duty to disclose.

CIBC also contends that respondents failed to establish any relationship between CIBC and respondents that can support a duty to disclose. CIBC's reliance on *Wilkins v. National Broadcasting Co.* (1999) 71 Cal.App.4th 1066 [84 Cal.Rptr.2d 329] (*Wilkins*) and *Kovich v. Paseo Del Mar Homeowners' Assn.* (1996) 41 Cal.App.4th 863 [48 Cal.Rptr.2d 758] (*Kovich*) is misplaced,

---

[15] California Code of Regulations, title 10, section 260.102.15 provides: "Paragraph (3) of Section 25102(f) of the [Corporations] Code requires that each purchaser represent that the purchaser is purchasing for the purchaser's own account (or a trust account if the purchaser is a trustee) and not with a view to or for sale in connection with any distribution of the security. For purposes of paragraph (3) of Section 25102(f) of the Code, an offer to resell or a resale made under Section 260.105.13.1 will not be viewed as inconsistent with such purchaser representation."

California Code of Regulations, title 10, section 260.105.13.1 provides: "There is hereby exempted from the provisions of Section 25130 of the [Corporations] Code as not being comprehended within the purposes of the Corporate Securities Law of 1968 and the qualification of which is not necessary or appropriate in the public interest or for the protection of investors any offer to resell or resale of restricted securities made in compliance with Rule 144A (17 CFR 230.144A) of the Securities and Exchange Commission."

as these cases are factually distinguishable. In *Wilkins*, owners of an adult entertainment telephone service asserted claims for fraud and invasion of privacy against a television network and some of its news journalists for conducting a hidden-camera interview with the owners and using the video-tape in a news broadcast. (*Wilkins, supra*, 71 Cal.App.4th at pp. 1071–1073.) The court found the journalists had no duty to disclose their true identities to the owners, reasoning that the parties lacked any relationship supporting this duty. (*Id.* at pp. 1082–1083.) Similarly, in *Kovich*, the court held that a homeowners association had no duty to disclose defects in a home to the buyer because the association was not the seller or a party to the sales agreement, and it had assumed no special relationship to the buyer. (*Kovich, supra*, 41 Cal.App.4th at p. 866.) In contrast with these cases, CIBC not only sold the unregistered notes, but it reviewed the registration statement, and thereafter repeatedly tendered advice about the registered notes to investors.[16]

### 6. *Scienter*

CIBC contends that it lacked the requisite scienter for intentional conceal-ment of the IRI report for RCI's 1996 holiday season, arguing that there is no substantial evidence that it had actual knowledge of the report's contents when it prepared the offering memorandum.[17] It argues that Dalton's memo-randum regarding RCI's poor third quarter for the 1996 fiscal year was prepared before IRI issued the report in late January 1997, and that there is no evidence CIBC received a copy of the IRI report. We are not persuaded. Generally, "[k]nowledge of falsity" or scienter is an element of fraud, with

---

[16] CIBC suggests that the trial court failed to instruct the jury that the duty to disclose is an element of a claim for intentional nondisclosure. We disagree. When, as here, a claim for intentional nondisclosure is not predicated on a fiduciary relationship, the elements of the claim are generally defined without an express reference to the duty to disclose. Thus, in *Lingsch v. Savage, supra*, 213 Cal.App.2d at page 738, the court stated: "The elements of a cause of action for damages for fraud based on mere nondisclosure and involving no confidential relationship would therefore appear to be the following: (1) Nondisclosure by the defendant of facts materially affecting the value or desirability of the property; (2) Defendant's knowledge of such facts and of their being unknown to or beyond the reach of the plaintiff; (3) Defendant's intention to induce action by the plaintiff; (4) Inducement of the plaintiff to act by reason of the nondisclosure; and (5) Resulting damages. [Citations.]" (Accord, *Continental Airlines, Inc. v. McDonnell Douglas Corp.* (1989) 216 Cal.App.3d 388, 404–405 [264 Cal.Rptr. 779].) Here, elements (1) and (2) specify the factual circumstances creating a duty to disclose. The jury was instructed in accordance with *Lingsch*, and thus there was no instructional error.

[17] CIBC frames this argument in terms of *materiality*, arguing that certain facts omitted or misrepresented in the offering memorandum and investment opinions were not material. Under California law, materiality in the context of fraud is generally examined as an aspect of justified reliance. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 976–977 [64 Cal.Rptr.2d 843, 938 P.2d 903]; *Reed v. King* (1983) 145 Cal.App.3d 261, 265 [193 Cal.Rptr. 130].) Because the crux of CIBC's argument is that it cannot be liable for nondisclosure of the IRI report because it was ignorant of the report, we examine the argument as an attack on the existence of scienter.

the exception of claims for negligent misrepresentation. (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 800, p. 1157.) A finding of scienter with respect to intentional concealment is examined for the existence of substantial evidence. (*Zinn v. Ex-Cell-O Corp.* (1957) 148 Cal.App.2d 56, 69 [306 P.2d 1017].)

Here, the record contains evidence that RCI received IRI data on a regular basis 24 to 30 days after a sales period, and that as of November 27, 1996, it had received IRI data for the period ending November 3, 1996. The record also discloses that CIBC obtained knowledge of IRI data through conversations with RCI employees.[18] When Mark Dalton supervised CIBC's preparation of the offering memorandum, he knew in early December 1996 that RCI was having a "poor third quarter." Moreover, in early January 1997, he was sufficiently aware of RCI's situation to question RCI's "padded" numbers and "squirrelly sales assumptions" for the following quarter. In our view, this evidence supports the reasonable inference that Dalton was well aware of the negative data in the IRI report, even if CIBC did not obtain a copy of it.[19]

### 7. *Reliance*

CIBC contends that respondents' claims fail for want of substantial evidence of justifiable reliance. To establish this element of fraud, plaintiffs must show (1) that they actually relied on the defendant's misrepresentations, and (2) that they were reasonable in doing so. (5 Witkin, Summary of Cal. Law, *supra*, Torts, § 808, pp. 1164–1165, § 812, pp. 1173–1174.)

---

[18] There was testimony that David Makuen, RCI's vice-president for marketing and strategic development until July 1997, shared IRI data orally with Raj Gupta, a CIBC employee who assisted in the preparation of the offering memorandum.

[19] CIBC raises two other related challenges to its liability for intentional nondisclosure of the IRI report. It argues that (1) respondents could have obtained the report themselves before they bought the registered notes in 1998, and (2) other information about RCI's poor 1996 holiday season was available to respondents when they bought the notes. These contentions are meritless. Respondents' failure to examine the IRI report, and their concomitant confidence in the offering memorandum, registration statement, and investment opinions, could not relieve CIBC of liability for intentional concealment unless respondents were aware that the representations in these publications were suspect. (5 Witkin, Summary of Cal. Law, *supra*, Torts, § 813, pp. 1174–1176.) As we explain below (see pt. I.A.7., *post*), the evidence supported the jury's determination that respondents justifiably relied on these publications.

CIBC also contends that it cannot be liable for negligent misrepresentations regarding the IRI sales data because it was unaware of the IRI report. This contention fails for the reasons given *ante*. Moreover, as Witkin observes, even "[i]f the defendant does believe the representations to be true, and merely lacks reasonable grounds for the belief, he is guilty . . . of negligent misrepresentation." (5 Witkin, Summary of Cal. Law, *supra*, Torts, § 800, p. 1157, italics omitted.) In view of the evidence of what Dalton knew, CIBC lacked reasonable grounds for making the representations it did in the offering memorandum.

#### a. *Actual Reliance*

We begin with the requirement of actual reliance. A plaintiff asserting fraud by misrepresentation is obliged to plead and prove actual reliance, that is, to " 'establish a complete causal relationship' between the alleged misrepresentations and the harm claimed to have resulted therefrom." (*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1092 [23 Cal.Rptr.2d 101, 858 P.2d 568], quoting *Garcia v. Superior Court* (1990) 50 Cal.3d 728, 737 [268 Cal.Rptr. 779, 789 P.2d 960].) Actual reliance is also an element of fraud claims based on omission. (*Mirkin v. Wasserman, supra,* 5 Cal.4th at p. 1093.)

CIBC contends that respondents did not establish this element because the evidence unequivocally showed that the "immediate cause" of respondents' decision to buy the registered notes was the precipitous fall in the price of the notes in early 1998. This argument misapprehends the required showing. " 'It is not . . . necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision.' " (*Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at pp. 976–977, quoting Rest.2d Torts, § 546, com. b, p. 103.) Regarding concealment claims, the plaintiff may establish this element by showing that "had the omitted information been disclosed, [he or she] would have been aware of it and behaved differently." (*Mirkin v. Wasserman, supra,* 5 Cal.4th at p. 1093.) Here, there is ample evidence that respondents relied on the offering memorandum, registration statement, and investment opinions in deciding that the market had undervalued the notes, and that respondents would not have bought the notes had they known about RCI's disastrous 1996 Christmas season and channel stuffing.

#### b. *Reasonable Reliance*

"Besides actual reliance, [a] plaintiff must also show 'justifiable' reliance, i.e., circumstances were such to make it *reasonable* for [the] plaintiff to accept [the] defendant's statements without an independent inquiry or investigation." (*Wilhelm v. Pray, Price, Williams & Russell* (1986) 186 Cal.App.3d 1324, 1332 [231 Cal.Rptr. 355].) The reasonableness of the plaintiff's reliance is judged by reference to the plaintiff's knowledge and experience. (5 Witkin, Summary of Cal. Law, *supra,* Torts, § 808, p. 1164.) " 'Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.' [Citations.]" (*Alliance Mortgage Co. v.*

*Rothwell* (1995) 10 Cal.4th 1226, 1239 [44 Cal.Rptr.2d 352, 900 P.2d 601], quoting *Blankenheim v. E. F. Hutton & Co.* (1990) 217 Cal.App.3d 1463, 1475 [266 Cal.Rptr. 593].)

■ CIBC contends that respondents' reliance on the offering memorandum and investment opinions was unreasonable in light of (1) other information available to respondents when they bought the registered notes, and (2) the presence of disclaimers within the memorandum and opinions. Generally, "[a] plaintiff will be denied recovery only if his conduct is manifestly unreasonable in the light of his own intelligence or information. It must appear that he put faith in representations that were 'preposterous' or 'shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth.' [Citation.] Even in case of a mere negligent misrepresentation, a plaintiff is not barred unless his conduct, in the light of his own information and intelligence, is preposterous and irrational. [Citation.]" (*Hartong v. Partake, Inc.* (1968) 266 Cal.App.2d 942, 965 [72 Cal.Rptr. 722].) The effectiveness of disclaimers is assessed in light of these principles. (*Winn v. McCulloch Corp.* (1976) 60 Cal.App.3d 663, 671 [131 Cal.Rptr. 597].)

### i. *Other Information*

CIBC contends that the record establishes that respondents acted irrationally in placing confidence in the offering memorandum and investment opinions. CIBC argues that respondents had access to RCI's SEC filings and press releases, which disclosed that RCI had experienced two consecutive disappointing holiday seasons. It also points to two memoranda prepared by TCW vice-president Shawn Bookin in March 1998, and a report sent to respondents by an outside analyst in April 1998.[20]

Bookin's memorandum, dated March 13, 1998, stated that "it is inconceivable that [RCI] did not know that it had a channel inventory problem," and that "[i]t is clear that for at least a year, [RCI] misrepresented reality [regarding this problem] and was essentially overstating revenues and cash flow"; the memorandum advised, "[t]urnaround will be difficult; this company is very sick." His subsequent memorandum dated March 29, 1998, stated that the decline in the fragrance market threatened RCI's business strategy and that RCI's "true operating results and potential [were] very difficult to assess," but nonetheless recommended buying the registered notes.

---

[20] CIBC also cites an anonymous handwritten note discovered in Pacholder's files that states, "I would not lend one dollar to this Co., period." At trial, evidence was admitted that the document may have been prepared by a broker not employed by Pacholder. Because the record does not identify the note's source, the note cannot establish that respondents unreasonably relied on CIBC's publications.

In April 1998, Chanin Kirkland Messina (CKM), an outside analyst, concluded that RCI was too "overleveraged" to execute its business plan and service its "near term debt," and that it had "flat sales growth" due to "the inability to integrate acquisitions" and "declines in the fragrance industry."

CIBC's argument misapprehends our role as an appellate court. Review for substantial evidence is not trial de novo. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762 [42 Cal.Rptr.2d 755].) On review for substantial evidence, "all of the evidence must be examined, but it is not weighed. All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed." (*Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384].)

Bookin testified that when he analyzed RCI's financial condition, RCI's SEC filings and press releases had only "started [the] process of dribbling out the bad information," and "there was a lot more to come." At the time, he did not believe that RCI's disclosures were only "the tip of the iceberg" because "the common practice" among troubled companies was "to get all the bad news out and move on with clean numbers going forward." According to Bookin, the statements in the March 13, 1998 report were based on his discovery of an accounting mistake by RCI, and he later deleted the statements upon the request of a supervisor, who concluded that the evidence was insufficient to support them. Regarding the reports, Bookin testified: "I was on the right track, but I didn't see the scam that had taken place and that there was a lot more behind it[,] and the category management, [the] computer systems, the channel stuffing . . . was all a problem waiting to explode." In view of the information then available, Bookin believed "there was still a lot of value there."

Richard Goldstein, a managing director for OCM, testified that the CKM report was a "pitch" to respondents to employ CKM as an advisor regarding RCI. Respondents eventually hired CKM in late June 1998. According to William Morgan, who is president and managing director of Pacholder, CKM evaluated RCI for respondents in June 1998, and concluded that RCI's worth was then sufficient for respondents to get "most, if not all of their money out."

In view of this testimony, we cannot conclude that the jury erred in determining that respondents reasonably relied on CIBC's representation, despite other information available to them when they bought the registered notes. On review for substantial evidence, " '[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a

judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*Daly v. Wallace* (1965) 234 Cal.App.2d 689, 692 [44 Cal.Rptr. 642], italics omitted, quoting *People v. Huston* (1943) 21 Cal.2d 690, 693 [134 P.2d 758].)[21]

### ii. *Disclaimers*

CIBC's challenge to reasonable reliance based on the disclaimers also fails. Regarding the offering memorandum, CIBC points to two disclaimers located in close proximity on the same page of the memorandum. The first disclaimer authorized prospective buyers to seek additional information from RCI regarding the offer, but limited CIBC's responsibility for any additional information.[22] The second disclaimer stated: "The information contained in this offering memorandum was obtained from [RCI] and other sources, but no assurance can be given as to the accuracy or completeness of such information. In making an investment decision, prospective investors must rely on their own examination of the company and the terms of the offering . . . ." (Capitalization omitted.)

We are not persuaded that these disclaimers precluded reasonable reliance as a matter of law. Immediately between them occurs the following statement: "Each person receiving this Offering Memorandum *represents that such person's investment decision is based solely on this Offering Memorandum* and that such person is not relying on any other information it may have received from [RCI], the Initial Purchaser or any other person." In view of this express invitation to base investment decisions on the offering memorandum, the disclaimers cited by CIBC—whatever their proper interpretation—

---

[21] To the extent that CIBC contends that RCI's SEC filings and press releases, taken by themselves, establish that respondents' reliance was unreasonable, CIBC has forfeited this contention for want of adequate citations and argument. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115–1116 [75 Cal.Rptr.2d 27].) Aside from citations to RCI's disclosures that it had experienced two poor holiday seasons, CIBC's briefs simply direct us to hundreds of pages of SEC filings and other documents, and assert that respondents "knew precisely what they were getting into." The rule that appellants must set forth material evidence is especially applicable when, as here, they challenge the sufficiency of the evidence to support a determination. (*Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 317 [82 Cal.Rptr.2d 649].)

[22] The first disclaimer stated in full: "Each person receiving this Offering Memorandum expressly acknowledges that (i) such person has been afforded an opportunity to request from [RCI] and to review, and has received, all additional information considered by it to be necessary to verify the accuracy of or to supplement the information herein; (ii) such person has not relied on [CIBC] or any person affiliated with [CIBC] in connection with its investigation of the accuracy of such information or its investment decision; and (iii) no person has been authorized to give information or to make any representations concerning [RCI] or the Notes other than as contained herein and, if given or made, such other representations should not be relied upon as having been authorized by [RCI] or [CIBC]."

could not render respondents' reliance "preposterous and irrational." (*Hartong v. Partake, Inc.*, *supra*, 266 Cal.App.2d at p. 965.)

CIBC argues that two other disclaimers rendered respondents' reliance on the offering memorandum in 1998 wholly unreasonable. The offering memorandum states: "Neither the delivery of this offering memorandum nor any sale made hereunder shall under any circumstances imply that the information herein is correct as of any date subsequent to the date hereof." (Capitalization omitted.) In addition, it states that it "has been prepared by [CIBC] solely for use in connection with" the sale of the unregistered notes. Noting that the offering memorandum is dated February 3, 1997, CIBC argues that respondents' reliance on it was untenable in light of other information available to them when they bought the registered notes in early 1998.

Viewed in context, these disclaimers cannot be regarded as asserting that the representations in the offering memorandum were unreliable after February 3, 1997. CIBC distributed the offering memorandum on February 4, 1997, and conducted the sale of the unregistered notes three days later. Nor do they indicate that the offering memorandum was not credible outside the scope of the transaction involving the unregistered notes. Andrew Heyer, CIBC's vice-chairman, testified that notwithstanding the disclaimers, the offering memorandum represented CIBC's best effort to provide a "financial and business snapshot of [RCI] as of February 3rd, 1997." Under these circumstances, respondents could regard the offering memorandum as a credible assessment of RCI's financial health during early 1997, despite the disclaimers. (See *Winn v. McCulloch Corp.*, *supra*, 60 Cal.App.3d at p. 671 [disclaimer that "specifications and performance were subject to change" does not conclusively preclude liability].)[23]

CIBC also contends that other disclaimers rendered respondents' use of the offering memorandum unlawful. The offering memorandum states that it is "highly confidential," and contains "material nonpublic information" that subjects investors who receive the memorandum to federal securities law. (Capitalization omitted.) CIBC thus argues that respondents obtained the memorandum in an unlawful manner because it contained confidential information protected by section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.) and Rule 10b-5. We disagree. Under these provisions, "information remains 'nonpublic' until either: (1) the information is

---

[23] For similar reasons, we reject CIBC's related contention that respondents' reliance on the offering memorandum was unreasonable in light of the memorandum's statement that it did not contain or rely on IRI data for any period after November 3, 1996. Because the offering memorandum otherwise invited investor reliance, respondents could reasonably conclude that it did not omit material IRI data of which CIBC was aware. (See *Winn v. McCulloch Corp.*, *supra*, 60 Cal.App.3d at pp. 670–671.)

'disclosed "to achieve a broad dissemination to the investing public generally and without favoring any special person or group," ' or (2) 'although known only by a few persons, their trading on it "has caused the information to be fully impounded into the price of the particular stock." ' [Citation.]" (*U.S. S.E.C. v. Talbot* (C.D.Cal. 2006) 430 F.Supp.2d 1029, 1042.) Here, there is substantial evidence that the offering memorandum had been widely distributed when respondents consulted it one year after the sale of the unregistered notes, and CIBC has not identified a single representation within the memorandum that remained "nonpublic" under the aforementioned tests.

Finally, CIBC contends that respondents could not reasonably have relied on the investment opinions because two of its opinions issued in February 1998 recommended "Hold" (rather than "Buy"), and every opinion contained the following disclaimer: "This has been prepared solely for informational purposes and is not an offer or solicitation to buy or sell any security. *It is based on sources believed to be reliable*, but we do not guarantee that it is accurate or complete." (Italics added.) This contention fails under the principles governing reasonable reliance. That CIBC recommended "Hold"— rather than "Sell"—signaled its confidence that the registered notes then retained value. Moreover, in view of the italicized language within the disclaimer, respondents' reliance on the opinions was neither "preposterous" nor "irrational." (*Hartong v. Partake, Inc.*, *supra*, 266 Cal.App.2d at p. 965.)

The cases CIBC cites in support of its contentions regarding the disclaimers are inapposite. One does not address the issue of reasonable reliance (*McGonigle v. Combs* (9th Cir. 1992) 968 F.2d 810, 822); in another, the court determined that investors who did not receive a document could not reasonably have relied on it (*Anderson v. Deloitte & Touche* (1997) 56 Cal.App.4th 1468, 1479 [66 Cal.Rptr.2d 512]). In the remaining cases, the courts held that reasonable reliance was untenable in the presence of a disclaimer because (1) the investor possessed incontrovertible evidence that the representations were false (*Atari Corp. v. Ernst & Whinney* (9th Cir. 1992) 981 F.2d 1025, 1029–1031); (2) the representation upon which the investor purportedly relied was not in the document (*Podlasky v. Price* (1948) 87 Cal.App.2d 151, 159–160 [196 P.2d 608], disapproved on another ground in *Gagne v. Bertran* (1954) 43 Cal.2d 481, 488, fn. 5 [275 P.2d 15]); and (3) the disclaimer expressly stated that no pertinent representation was made in the document (*Resolution Trust Co. v. Rowe* (N.D.Cal., May 7, 1993, No. C 91-3968-BAC) 1993 WL 165303, at p. *3). These circumstances are not present here.

### 8. *Resulting Damages*

CIBC contends that there is insufficient evidence that respondents suffered cognizable damages as the result of CIBC's conduct. Under California

law, a party asserting fraud must establish that its damages are the "proximate" or "legal" result of the fraudulent conduct. (*Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 364 [17 Cal.Rptr.3d 39]; *Hill v. Wrather* (1958) 158 Cal.App.2d 818, 824 [323 P.2d 567].) Moreover, California law generally limits a defrauded party to recovering out-of-pocket damages, as stated in Civil Code section 3343. (*Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal.4th at pp. 1240–1241.) The out-of-pocket rule " 'is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received.' " (*Id.* at p. 1240, quoting *Stout v. Turney* (1978) 22 Cal.3d 718, 725 [150 Cal.Rptr. 637, 586 P.2d 1228].) CIBC contends respondents (1) did not show that CIBC's conduct was the proximate cause of their losses, and (2) failed to provide adequate evidence of the amount of their damages.

### a. *Proximate Causation*

■■■ CIBC contends that respondents did not adequately establish that CIBC's fraud was the proximate cause of the decline in value of the registered notes after respondents bought them. As explained below, we disagree. Generally, to recover for fraud, the plaintiff must prove " ' "detriment proximately caused" by the defendant's tortious conduct. [Citation.] Deception without resulting loss is not actionable fraud. [Citation.] "Whatever form it takes, the injury or damage must not only be distinctly alleged but its causal connection with the reliance on the representations must be shown." ' [Citations.]" (*Goehring v. Chapman University, supra,* 121 Cal.App.4th at p. 364.)

■■■ The elements of reliance and proximate causation are distinct. In *Gagne v. Bertran, supra,* 43 Cal.2d at pages 484–485, the plaintiffs hired the defendant to determine the level of fill on property the plaintiffs intended to buy in order to build an apartment building. After the defendant reported that there was no more than 16 inches of fill, the plaintiffs bought the property and discovered several feet of fill, which forced them to build a deeper foundation for the building than they had expected. (*Id.* at p. 485.) After the plaintiffs brought a fraud action against the defendant, our Supreme Court concluded that despite the plaintiffs' reliance on the defendant's report, they had not submitted evidence that the actual value of the property was less than they had paid for it, and thus had not shown that the facts misrepresented in the report had caused them damages, as assessed by the out-of-pocket rule. (*Id.* at pp. 490–492.)

Similarly, in *Hill v. Wrather, supra,* 158 Cal.App.2d at page 824, investors asserted that they had been fraudulently induced to buy stock. They alleged

that the individuals who had sold the stock had concealed the fact that they were married, and that the investors would not have bought the stock had they known of the marriage. (*Ibid.*) The court concluded that the fraud claim failed, notwithstanding the existence of reliance, because nothing suggested the investors had paid more than the actual value of the stock; thus "reliance upon [the false representations] could not produce injury in a legal sense." (*Ibid.*)

 Although reliance and proximate causation are distinguishable, the facts establishing their existence are often intertwined. In *Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1147–1151 [23 Cal.Rptr.3d 335] (*Persson*), the two equal shareholders in a close corporation fell into a dispute, and one agreed to sell his shares to the other. After the sale was consummated, the seller brought an action for fraud and breach of fiduciary duty against the buyer, alleging that the buyer had concealed information about the corporation's future profits, thereby causing the seller to offer his shares at less than their actual value. (*Ibid.*)

The court in *Persson* affirmed the judgment in the seller's favor, insofar as it rested on fraud claims, concluding that the buyer had breached his duty to disclose material information, that is, facts "a reasonable investor would have considered." (*Persson, supra,* 125 Cal.App.4th at pp. 1162–1167.) In so concluding, the court addressed the buyer's challenge to the existence of proximate causation, namely, that the concealed facts did not cause the seller's losses, as measured by the out-of-pocket rule, because the method that the seller had selected to determine the value of his shares would not have made use of them. (*Id.* at pp. 1165–1167.) The court agreed that "if damages do not flow from the concealment, but rather from some other extrinsic factor, the award of damages would be improper." (*Id.* at p. 1166.) It nonetheless rejected the buyer's contention, reasoning that the seller "was deprived of information he should have had in making his evaluation of the price at which to sell, and from this deprivation it is reasonable to conclude the concealment was a proximate cause of the damages." (*Id.* at p. 1167.)

We confront an issue not addressed in *Persson*, namely, the proximate causation of damages, as measured by the out-of-pocket rule, arising out of the sale of publicly traded securities. For guidance, we look to sections 548A & 549 of the Restatement Second of Torts (sections 548A & 549), which address the application of the out-of-pocket rule to damages of which a fraudulent

misrepresentation "is a legal cause."[24] The comments to these sections clarify the role of proximate causation in determining (1) the entitlement to damages and (2) their amount.

As comment b to section 548A explains, the entitlement to damages requires the existence of proximate causation, that is, a causal link between the losses and the "facts misrepresented": "[O]ne who misrepresents the financial condition of a corporation in order to sell its stock will become liable to a purchaser who relies upon the misinformation for the loss that he sustains when the facts as to the finances of the corporation become generally known and as a result the value of the shares is depreciated on the market, because that is the obviously foreseeable result of the facts misrepresented. On the other hand, there is no liability when the value of the stock goes down after the sale, not in any way because of the misrepresented financial condition, but as a result of some subsequent event that has no connection with or relation to its financial condition. There is, for example, no liability when the shares go down because of the sudden death of the corporation's leading officers." (Rest.2d Torts, § 548A, com. b, p. 107.)

Comment c to section 549, which addresses the assessment of value for the purposes of the out-of-pocket rule, clarifies the relationship between proximate causation and the amount of losses in transactions involving the sale of securities. Comment c states: "In a sales or exchange transaction the loss for which the recipient of a fraudulent misrepresentation is entitled to recover is usually the difference between the price paid or the value of the thing given in exchange and the value of the thing acquired. The value of the article is normally determined by the price at which it could be resold in an open market or by private sale if its quality or other characteristics that affect its value were known." (Rest.2d Torts, § 549, com. c, p. 110; accord, *Bagdasarian v. Gragnon* (1948) 31 Cal.2d 744, 753 [192 P.2d 935].)

██ Recognizing that a misrepresentation, if broadly accepted by investors, may render the market price of a security "fictitious," comment c elaborates special principles applicable to fraud involving securities. Generally, "if the recipient of the misrepresentation, in reliance upon it, retains the

---

[24] Section 548A states: "A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance."

Section 549 states: "(1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including [¶] (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and [¶] (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation. [¶] (2) The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty."

securities either as a permanent or temporary investment, their value is determined by their market price after the fraud is discovered when the price ceases to be fictitious and represents the consensus of buying and selling opinion of the value of the securities . . . in the interim . . . , his loss is the difference between the price paid and that received." (Rest.2d Torts, § 549, com. c, p. 110.)

Comment c explains that this rule implicates proximate causation: the market price of an investment after its purchase date is not an indicator of the investment's actual value when purchased unless the decrease in the market price has some form of causal "connection with or relation to the matter [fraudulently] represented." (Rest.2d Torts, § 549, com. c, p. 111.) If there is no such connection or relation, the investor who has relied upon the misrepresentation cannot establish a loss. Comment c provides the following illustration: "[A] shareholder in a bank induced to retain his stock by the fraudulent misrepresentation of its president that [a particular series of sales] were bona fide transactions is not entitled to recover for the depreciation of the shares due solely to the subsequent speculations of the cashier of the bank." (*Ibid.*)

In contrast, if such a connection or relation exists, the investor may recover damages, even though "subsequent changes in financial or business conditions are factors which, in conjunction with the falsity of the misrepresentation, contribute[d] to diminish or increase the market price of the securities." (Rest.2d Torts, § 549, com. c, p. 111.) Comment c states: "Thus, when a promoter induces an investor to subscribe to shares in a corporation by false statements of the amount of capital subscribed and of its assets, the fact that the insolvency of the corporation was in part due to the depressed condition of the industry in question does not prevent the investor from recovering his *entire loss* from the promoter, since if the corporation had had the capital and assets that it was represented as having, its chance of surviving the depression would have been greatly increased." (*Ibid.*, italics added.)

Respondents' circumstances fall squarely within the latter situation depicted in comment c. They knew about RCI's distressed condition and the general deterioration of the mass fragrance market, but nonetheless concluded the securities market had undervalued the registered notes after they assessed CIBC's representations, which convinced them that RCI possessed considerable assets. These facts, coupled with the evidence concerning respondents' experience in identifying undervalued companies, support the reasonable inference that if RCI had possessed the assets represented in the offering memorandum and investment opinions, it probably would not have collapsed as it did. Respondents thus showed that RCI's collapse had the requisite

"connection with or relation to the matter[s]" that CIBC had fraudulently misrepresented and concealed. (Rest.2d Torts, § 549, com. c, p. 111.)

CIBC contends that respondents failed to establish proximate causation because the record demonstrates that the omissions in the offering memorandum never became publicly known before RCI's liquidation, and the direct cause of RCI's bankruptcy was GECC's decision to force liquidation. It thus argues that RCI's collapse and the concomitant worthlessness of the registered notes flowed exclusively from the demise of its business plan and GECC's impatience.

This argument misapprehends the principles explained in comment b to section 548A and in comment c to section 549. We see no requirement in the comments that respondents were obliged to show that public knowledge of CIBC's concealment played a role in RCI's collapse, or that the public was fully aware of all the factual details that CIBC had concealed. As comment b to section 548A explains, proximate causation involves only a "connection with or relation" between the losses and the "facts misrepresented." (Rest.2d Torts, § 548A, com. b, p. 107.) Comment c to section 549 further explains that for purposes of the out-of-pocket rule, the basic measure of the actual value of a security is "the price at which it could be resold in an open market . . . if *its quality or other characteristics that affect its value were known.*" (Rest.2d Torts, § 549, com. c, p. 110, italics added.) Because this hypothetical price may be difficult to assess, the defrauded investor is permitted to establish the actual value of a security at the time of purchase by reference to its market price when the misrepresented or concealed "matter" becomes publicly known, provided this underlying "matter" played a causal role in the decrease in the market price. (*Id.* at pp. 110–111.)

In our view, respondents established proximate causation for the purposes of showing (1) their entitlement to damages and (2) the amount of the damages. Regarding item (1), the factual "matter" that CIBC concealed was the failure of RCI's business plan in early 1997. In view of the trial evidence, the jury could properly conclude that RCI was a dead or dying business when CIBC prepared the offering memorandum, and that RCI remained in existence due to the funds it obtained through the Rule 144A transaction, which succeeded only because of CIBC's concealment. Accordingly, respondents demonstrated their entitlement to damages under the principles stated in comment b to section 548A.

Regarding item (2), the fact that the public never knew the details of CIBC's concealment prior to RCI's collapse does not render the final market price of the registered notes an inadequate measure of their actual value when respondents bought them. The price of the notes fell precipitously in 1998

due to public awareness that RCI was struggling to survive the downturn in the mass fragrance market; due to CIBC's concealment, the public never became fully aware that RCI's business plan had failed much earlier. Because the concealed aspects of RCI's condition, if revealed, would only have accelerated the fall in the notes' market price, the ultimate market value of the notes—namely, zero—is evidence of their actual value when purchased by respondents.

CIBC directs our attention to federal case law, which examines the requirements for reliance and proximate causation in the context of Rule 10b-5 claims. These cases do not reach the precise issues regarding proximate causation presented here, and their discussions are otherwise consistent with our analysis of these issues. (*Dura Pharmaceuticals, Inc. v. Broudo* (2005) 544 U.S. 336, 342–343 [161 L.Ed.2d 577, 125 S.Ct. 1627] [discussing proximate causation in relation to the "fraud-on-the-market" theory of reliance peculiar to Rule 10b-5 claims]; *Binder v. Gillespie* (9th Cir. 1999) 184 F.3d 1059, 1065–1066 [plaintiff asserting Rule 10b-5 claim must show " 'loss causation,' " that is, "the fraud caused, or at least had something to do with, the decline in the value of the investment after the securities transaction took place"].) They therefore do not disturb our conclusions.

CIBC also contends that respondents failed to show that CIBC's fraudulent conduct was the proximate cause of one item of damages, namely, the funds that respondents loaned to RCI in August 1998. They argue that these funds cannot be recovered because respondents then knew about RCI's dire financial condition. We disagree. A defrauded party whose claim is subject to the out-of-pocket measure of damages may also recover funds expended to mitigate damages, provided that the funds "do[] not exceed the damages prevented or reasonably anticipated." (*Hartong v. Partake, Inc.*, *supra*, 266 Cal.App.2d at p. 968.) Mitigation of damages is a question of fact, and is subject to review for the existence of substantial evidence. (*Green v. Smith* (1968) 261 Cal.App.2d 392, 397 [67 Cal.Rptr. 796].)[25]

Here, respondents presented evidence that to forestall GECC's liquidation of RCI, they loaned RCI $2 million to fund RCI's 1998 holiday season, thereby hoping to preserve their approximately $54 million investment in the registered notes. In view of this evidence, the jury was entitled to conclude that the loans were made to mitigate damages.

b. *Amount of Damages*

CIBC contends that the evidence in the record does not support the damages awarded by the jury. During closing argument, respondents asserted

---

[25] The jury received instructions on the mitigation of damages.

that their damages, as measured by the out-of-pocket rule, were $51,971,156. This sum essentially reflects the total amount they had paid for the registered notes ($53,803,900) and their net losses from the loans they made to RCI in August 1998 ($1,300,505), with a reduction for interest payments they received as holders of the notes ($3,133,250). As we discuss further below (see pt. I.B., *post*), the jury awarded the requested damages in their entirety.

CIBC argues that no evidence supports the jury's implied finding that the registered notes were worthless when respondents purchased them. We disagree. As we have explained (see pt. I.A.8.a., *ante*), the final value placed on the notes by the market—that is, no value at all—is properly viewed as their actual value when purchased by respondents. (Rest.2d Torts, § 549, com. c, p. 111.) In addition, Mark Attanasio, a managing director for TCW, testified that the notes were worthless between February and July 1998, and their positive market price only reflected the public's ignorance of RCI's dire condition. TCW vice-president Shawn Bookin testified the notes were "worthless" when issued because RCI's business plan had already failed, and RCI had prolonged its existence solely by channel stuffing to secure loans. Similarly, Richard Goldstein, an OCM managing director, testified that RCI was "dying or dead" when the unregistered notes were issued. In view of this evidence, the jury could properly have concluded that the registered and unregistered notes were *always* worthless—in the sense that there was never an appreciable chance that they would be repaid—and thus the registered notes held by respondents were valueless when purchased.

█ Pointing to *Fragale v. Faulkner* (2003) 110 Cal.App.4th 229 [1 Cal.Rptr.3d 616] (*Fragale*), CIBC argues that Attanasio's and Bookin's testimony does not constitute substantial evidence because they were not presented as expert witnesses regarding the value of the notes. CIBC is mistaken. Under Evidence Code section 800, which governs the admissibility of lay opinion, "a nonexpert witness may give his opinion as to the value of his property or the value of his own services." (Cal. Law Revision Com. com., reprinted at 29B pt. 3 West's Ann. Evid. Code (1995 ed.) foll. § 800, p. 4.) This rule encompasses the valuation of abstract rights. (*Golding v. R.K.O. Pictures, Inc.* (1950) 35 Cal.2d 690, 700–701 [221 P.2d 95] [rights to motion picture].)

As our Supreme Court explained in *Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 921 [114 Cal.Rptr. 622, 523 P.2d 662]: "The opinion of an owner of personal property is in itself competent evidence of the value of that property, and sufficient to support a judgment based on that value. [Citations.] 'The credit and weight to be given such evidence and its effect . . . is for the trier of fact.' [Citation.]" (Quoting *Windeler v. Scheers Jewelers* (1970) 8 Cal.App.3d 844, 853 [88 Cal.Rptr. 39].) Appellate courts

accord broad deference to the trial court's decision to admit lay opinion testimony that is subject to cross-examination. (*Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 112 [273 Cal.Rptr. 457].)

In view of these principles, there was no error. Attanasio and Bookin had considerable financial training and experience, they played key roles in TCW's purchase of the registered notes, and their opinions emerged during cross-examination. *Fragale* is factually distinguishable, and thus does not disturb our conclusion. There, the trial court declined to admit testimony from a homeowner about the hypothetical value his house would have had if certain defects had been remedied. (*Fragale*, *supra*, 110 Cal.App.4th at p. 240.) The court in *Fragale* affirmed, reasoning that the homeowner failed to show that he had any familiarity with information bearing on this value. (*Id.* at pp. 240–241.) That is not the case here.

CIBC also argues that respondents' receipt of interest payments from the registered notes conclusively rebuts Attanasio's and Bookin's testimony that the notes were worthless. At trial, the jury heard testimony that upon issuance of the unregistered notes, $17 million was placed in an escrow account to guarantee the initial interest payments. The purpose of the escrow account was to make the unregistered notes more attractive to prospective buyers. Respondents received interest from the account until it was exhausted. In seeking damages, respondents adjusted their claim for losses to reflect the interest payments.

Given this record, the jury could reasonably have concluded that Attanasio's and Bookin's testimony addressed the value of the notes, independent of the guaranteed interest payments. On review for the existence of substantial evidence, we do not disturb the jury's resolution of apparent conflicts in the evidence. (*Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 878 [151 Cal.Rptr. 285, 587 P.2d 1098]; *In re Frederick G.* (1979) 96 Cal.App.3d 353, 366 [157 Cal.Rptr. 769].)

### B. *Jury Verdict*

CIBC contends the trial court improperly awarded respondents a "double recovery" of damages based on the jury's verdict. As we explain below, this contention is meritless.

Generally, " '[a] verdict should be interpreted so as to uphold it and to give it the effect intended by the jury, as well as one consistent with the law and the evidence.' " (*All-West Design, Inc. v. Boozer* (1986) 183 Cal.App.3d 1212, 1223 [228 Cal.Rptr. 736] (*All-West Design*), quoting 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 343, p. 343.) Here, the jury was

asked to fill out two general verdict forms. The form entitled "General Verdict No. 1" contained a table with three columns. The first two columns identified, respectively, respondents' five causes of action, and the respondents; the third provided spaces for the jury to enter its award of damages to each respondent.[26] The table was arranged so that for each claim, the jury could identify which, if any, of the respondents had prevailed on the claim, and the amount of damages to be awarded to each respondent for that claim.

The following instruction accompanied the table: "You may not award more in damages for any particular claim than you award in total damages in your response to General Verdict No. 2. Do not be concerned if the total of the amounts entered in the right-hand column when added together is greater than the total damages awarded in your response to General Verdict No. 2. The Court will adjust for any duplication." The form entitled "General Verdict No. 2" asked the jury to enter the total damages (aside from punitive damages and interest) awarded to each respondent.

During closing argument, respondents' counsel discussed the table under General Verdict No. 1 and asked the jury to assign *all* of respondents' requested damages (with minor qualifications) to *each* of the five claims. In rendering the verdict, the jury entered sums under General Verdict No. 2 that totaled $51,971,156, that is, the amount respondents had indicated as their total damages during closing argument. Under General Verdict No. 1, the jury found CIBC liable to respondents under all their claims except intentional misrepresentation, but indicated that it had awarded damages solely for intentional nondisclosure and negligent misrepresentation. With respect to *each* of these two claims, the jury entered damages totaling $25,985,577, half the amount respondents had urged in closing argument.

Respondents asked the trial court to seek clarification of the verdicts, contending that the jury had misunderstood the instruction accompanying General Verdict No. 1, and had erroneously allocated the total award between the two claims. They noted that the jury had expressly found that respondents had suffered damages from intentional nondisclosures and negligent misrepresentations by CIBC. Because the evidence at trial unequivocally established that respondents had relied on *all* of CIBC's representations in buying the registered notes and making loans to RCI, respondents contended the record provided no rational basis for attributing some of respondents' damages to CIBC's intentional nondisclosures, and the remainder to CIBC's negligent misrepresentations. Respondents proposed a supplemental jury instruction regarding clarification of the verdicts.

---

[26] Respondents jointly asserted three claims for intentional and negligent misrepresentation, and intentional nondisclosure; in addition, OCM and Pacholder asserted two claims for violation of Corporations Code section 25500 and federal securities law.

CIBC opposed respondents' request, arguing that the jury had complied with the instruction as to General Verdict No. 1. According to CIBC, General Verdict No. 1 reflected the jury's determination that respondents had suffered only $25,985,577 in damages, and thus respondents could not recover more than this sum, regardless of the number of theories of recovery on which they had prevailed. CIBC nonetheless proposed a supplemental verdict form should the trial court ask for clarification from the jury.

After the trial court decided to seek clarification, it proposed questioning the jury foreman in the jury's presence, in lieu of instructing the jury with the parties' supplemental instructions The parties agreed. CIBC's counsel stated that although CIBC preserved its objection to seeking clarification, it had no objection "to the form of that procedure."[27] The trial court read the jury's awards under General Verdict No. 2 and asked the foreman: "Are these the amounts you intended each plaintiff to receive by your verdict." The foreman responded, "Yes, your honor," and the trial court dismissed the jury. It then entered judgment in accordance with General Verdict No. 2.[28]

CIBC contends that the trial court (1) improperly sought clarification from the jury, (2) improperly asked for clarification from the foreman alone, and (3) incorrectly assessed respondents' damages. Regarding item (1), our Supreme Court confronted a similar contention in *Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452 [72 Cal.Rptr. 217, 445 P.2d 881] (*Woodcock*). There, an injured worker sued a contractor for negligence, and an insurer intervened to recover workers' compensation funds it had paid to the worker. (*Id.* at pp. 454–455.) The trial court instructed the jury to determine " 'the full amount of the damages,' " without any reduction for the intervener's claim. (*Ibid.*, italics omitted.) After the jury returned a verdict that the worker had suffered $13,000 in damages, the parties fell into a dispute as to whether the award required an adjustment for the workers' compensation funds, to prevent an improper double recovery by the worker. (*Id.* at p. 456.) Notwithstanding the instructions to the jury, the court in *Woodcock* concluded that the verdict was ambiguous because it did not specify whether the award constituted gross or net damages. (*Id.* at p. 456.)

---

[27] We recognize that CIBC's counsel later objected to the trial court's proposal to question the foreman *in the presence of the jury*, citing the possibility that a colloquy between the court and the foreman might influence the other jurors. Because the court never directed any questions to the other jurors, this objection is insufficient to preserve CIBC's contention on appeal.

We also note that the reporter's transcript indicates that CIBC's counsel at one point remarked that questioning the foreman was "not appropriate." As CIBC apparently recognizes in its reply brief, this seems to be a typographical error: CIBC's counsel actually stated that the procedure was "not inappropriate."

[28] The damage award in the judgment reflects adjustments for funds respondents received in various settlements.

We reach the same conclusion here. General Verdict No. 2 asked the jury to determine the "total award" of damages, but did not specify whether this meant merely the cumulative sum of the damages awarded for each claim under General Verdict No. 1, or the entirety of the damages to which respondents were entitled. Moreover, the instructions to General Verdict No. 1 told the jury that the trial court would make suitable adjustments if the cumulative awards under General Verdict No. 1 exceeded the sums in General Verdict No. 2, but it did not bar the jury from making its own attempt to reconcile the two general verdicts. The trial court therefore did not err in ruling that clarification was necessary. (See *Woodcock, supra,* 69 Cal.2d at p. 456.)

Regarding item (2), the procedure used by the trial court was defective. (*Tri-Delta Engineering, Inc. v. Insurance Co. of North America* (1978) 80 Cal.App.3d 752, 758 [146 Cal.Rptr. 14] [trial court improperly sought clarification of verdict by questioning foreman in presence of jurors].) " 'If the verdict is ambiguous the party adversely affected should request a more formal and certain verdict. Then, if the trial judge has any doubts on the subject, he may send the jury out, under proper instructions, to correct the informal or insufficient verdict.' " (*Woodcock, supra,* 69 Cal.2d at p. 456.) However, in agreeing to the procedure, CIBC forfeited its challenge to the procedure. (9 Witkin, Cal. Procedure, *supra,* Appeal, §§ 388–389, pp. 439–440.)

Finally, regarding item (3), CIBC contends that the foreman's answer did not fully resolve the issue concerning damages, arguing that the jury may have incorrectly believed that it was *entitled* to award a double recovery to respondents. In our view, nothing in the record supports CIBC's suggestion that the jury suffered from this misapprehension of law; rather, the record supports the conclusion that the damages entered on the General Verdict No. 2 form reflected the actual damages the jury intended to award each respondent. In sum, the trial court properly entered judgment in accordance with the jury's award under General Verdict No. 2.

## II.

OCM and Pacholder contend in their cross-appeal that the trial court erroneously denied them prejudgment interest under Corporations Code

section 25500.[29] In view of the jury's verdict that they had prevailed on their claim against CIBC under Corporation Code sections 25400 and 25500, we agree.[30]

■ "[S]ection 25400 . . . provides that it is unlawful in this state to make false statements or engage in specified fraudulent transactions which affect the market for a security when done for the purpose of inducing purchase or sale of the security or raising or depressing the price of the security. In short, it prohibits market manipulation. Section 25500 creates a civil remedy for buyers or sellers of stock the price of which has been affected by the forms of market manipulation proscribed by section 25400." (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1040 [80 Cal.Rptr.2d 828, 968 P.2d 539], fns. omitted.) Corporations Code section 25500 provides that buyers of securities affected by willful violations of Corporations Code section 25400 "shall" receive damages as measured by the out-of-pocket rule, plus prejudgment interest.[31]

■ "It is the function of the trial judge to interpret the verdict from its language considered in connection with the pleadings, evidence and instructions, and if the trial court has refused to do so or has interpreted it erroneously, the appellate court will interpret the verdict if it is possible to give a correct interpretation. [Citations.]" (*Telles v. Title Ins. & Trust Co.* (1969) 3 Cal.App.3d 179, 185 [83 Cal.Rptr. 444].) Here, the jury indicated under General Verdict No. 1 that OCM and Pacholder had prevailed on their claim under Corporations Code section 25500, but it awarded them each "$0" as damages. Subsequently, OCM and Pacholder requested prejudgment interest under section 25500, arguing that the jury, in awarding out-of-pocket damages for intentional concealment and negligent misrepresentation, could not have found that respondents did not suffer out-of-pocket damages under section 25500, and that the verdict on this matter necessarily represented juror confusion. The trial court denied this request.

We find dispositive guidance on the issue before us in *All-West Design*. There, the cross-plaintiff in an action asserted claims for breach of contract and fraud against the cross-defendants, and asserted in closing argument that

---

[29] Because TCW did not assert claims under Corporations Code section 25500 and federal securities law, respondents' counsel sought neither damages nor prejudgment interest for TCW.

[30] All further statutory citations are to the Corporations Code, unless otherwise indicated.

[31] Corporations Code section 25500 states: "Any person who willfully participates in any act or transaction in violation of Section 25400 shall be liable to any other person who purchases or sells any security at a price which was affected by such act or transaction for the damages sustained by the latter as a result of such act or transaction. Such damages shall be the difference between the price at which such other person purchased or sold securities and the market value which such securities would have had at the time of his purchase or sale in the absence of such act or transaction, plus interest at the legal rate."

he had suffered a total of $10,975 in damages. (*All-West Design, supra,* 183 Cal.App.3d at pp. 1215–1216, 1219.) The verdict form asked the jury to render special verdicts regarding the compensatory damages due to breach of contract, the compensatory damages due to each of two acts of fraudulent conduct, and the punitive damages to be awarded (if any) on the basis of the fraudulent conduct. (*Id.* at pp. 1220–1225.) The jury returned special verdicts awarding $9,350 for breach of contract, $1,625 for the first fraudulent act, " 'No Further Damages' " for the second fraudulent act, and substantial punitive damages. (*Ibid.*)

On appeal, the cross-defendants contended that the verdict form improperly permitted the jury to award punitive damages on the basis of the fraudulent conduct which had been assigned " 'No Further Damages,' " and which the cross-defendants argued meant "no damages." (See *All-West Design, supra,* 183 Cal.App.3d at pp. 1220–1225.) Observing that the evidence at trial permitted the jury to distinguish $9,350 in contract damages and an additional $1,625 in damages for fraud, the court rejected this contention. (*Id.* at p. 1224.) It reasoned that after the jury allocated the contract damages and attributed $1,625 in damages to the first fraudulent act, it found " 'No Further Damages' " regarding the second fraudulent act solely to prevent a double recovery, rather than to indicate that the second act had not caused damages. (*Id.* at p. 1224.)

We reach the same conclusion here. As we have explained (see pt. I.B., *ante*), the trial court's request for clarification established that the jury intended to award respondents the entirety of their requested damages. The record provides no rational basis for distinguishing the damages caused by CIBC's negligent misrepresentations from the damages caused by CIBC's intentional nondisclosures, and thus the damage findings under General Verdict No. 1 must be viewed as a mistaken attempt to allocate damages. Because the jury found that OCM and Pacholder had prevailed on their Corporations Code section 25500 claim and that respondents were entitled to out-of-pocket damages under the theory of intentional nondisclosure, the jury could not rationally have found that OCM and Pacholder had not suffered the *same* out-of-pocket damages for the *same* misconduct under section 25500. Accordingly, we conclude the award of "$0" in damages regarding the section 25500 claim represents a confused attempt to prevent a double recovery, rather than a finding that OCM and Pacholder did not suffer damages.

Our conclusion finds additional support in *Bird v. John Chezik Homerun, Inc.* (8th Cir. 1998) 152 F.3d 1014. There, the plaintiff asserted claims for common law fraud and violations of an antifraud statute predicated on the same misconduct. (*Id.* at pp. 1015–1016.) The jury's special verdicts awarded the plaintiff damages for common law fraud and found that the defendant had

violated the antifraud statute, but declined to award damages for the latter violations. In view of the special verdicts, the trial court refused to permit the jury to determine whether the plaintiff was entitled to punitive damages under the antifraud statute. (*Id.* at p. 1016.) The Eighth Circuit reversed, concluding that "[t]he only plausible explanation for the jury's failure to award damages [under the statutory claim] is that the jury had already awarded [the plaintiff] damages [under the common law claim] for essentially the same conduct and did not want to award her the same damages twice." (*Id.* at p. 1017.)

Pointing to *Haydel v. Morton* (1935) 8 Cal.App.2d 730 [48 P.2d 709], CIBC contends that there is an absolute bar against interpreting the jury's verdict as having any meaning other than that OCM and Pacholder had suffered "$0" in damages under Corporations Code section 25500. We disagree. In *Haydel v. Morton*, the sole indication of ambiguity in the jury's finding that the plaintiff had suffered no compensatory damages was that the jury had also awarded punitive damages. (8 Cal.App.2d at pp. 736–737.) That is not the case here. As we have explained (see pt. I.B., *ante*), the verdicts rendered by the jury were ambiguous, and required clarification.

CIBC contends that OCM and Pacholder forfeited their claims of entitlement to prejudgment interest by (1) consigning prejudgment interest to the discretion of the jury, and (2) failing to press for clarification from the jury regarding its special verdict about damages under Corporations Code section 25500. Again, we disagree. Regarding item (1), the jury was instructed that it had the discretion to award prejudgment interest, which it declined to do. Nothing in the instruction suggests that it addressed interest other than that permitted under Civil Code section 3288, which provides that "in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury." Regarding item (2), OCM and Pacholder questioned the consistency of General Verdict No. 1 with General Verdict No. 2, and then agreed to the trial court's proposal to clarify them. For the reasons explained above, the trial court's questioning of the foreman established that the jury intended to award the damages identified on the General Verdict No. 2 form, and that the damage findings on the General Verdict No. 1 form represented an attempt to allocate damages. In our view, this determination also resolves the issue regarding prejudgment interest under Corporations Code section 25500.[32]

---

[32] CIBC also argues that Corporations Code section 25500 does not award prejudgment interest from the date of the purchase of securities. We are not persuaded. In interpreting a statute, "courts must look first to the words of the statute, giving effect to their plain meaning." (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1437 [35 Cal.Rptr.2d 155].) Here, section 25500 states that the damages awarded under it "shall be the difference between the price at which such other person purchased or sold securities and the market value which such securities would have had at the time of his purchase or sale in the absence of such act or transaction,

## DISPOSITION

The judgment is reversed with respect to the denial of prejudgment interest to OCM and Pacholder under Corporations Code section 25500, and the matter is remanded to the trial court for further proceedings in accordance with this opinion. In all other respects, the judgment is affirmed. Respondents and cross-appellants are awarded their costs.

Epstein, P. J., and Suzukawa, J., concurred.

A petition for a rehearing was denied December 28, 2007, and on December 26, 2007, the opinion was modified to read as printed above. The petition of appellant CIBC World Markets Corp. for review by the Supreme Court was denied March 19, 2008, S158928. Kennard, J., was of the opinion that the petition should be granted.

---

plus interest at the legal rate." Because there is no reference to any date other than the date of pertinent transaction, prejudgment interest under section 25500 accrues from that date.