Filed 3/19/15  In re J.G. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b).  This opinion has not been certified for publication or ordered published for purposes of rule 977.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re J.G., a Person Coming Under the Juvenile Court Law. | B258811 (Los Angeles County Super. Ct. No. CK66870) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MICHELLE G., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Juvenile Court of Los Angeles County.  Sherri Sobel, Referee.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel and Jeanette Cauble, Senior Deputy County Counsel for Plaintiff and Respondent.

No appearance on behalf of Minor.

\* \* \* \* \* \*

Michelle G. (mother) appeals the order of the juvenile court terminating parental rights to her son, J.G. Mother challenges the court's finding that she did not establish an exception to adoption under Welfare and Institutions Code[1] section 366.26, subdivision (c)(1)(B)(i). Because we conclude that substantial evidence supports the juvenile court's finding, we affirm the order terminating parental rights.

FACTUAL AND PROCEDURAL BACKGROUND

J.G. was born in October 2006. DCFS previously provided mother with family reunification and maintenance services. In October 2010, mother obtained a family law order giving her sole physical and legal custody of J.G.

On October 11, 2011, the Department of Children and Family Services (DCFS or the Department) filed a petition pursuant to section 300, subdivisions (b) and (g), alleging that mother had a history of substance abuse and was a current abuser of methamphetamine; father had a history of substance abuse and was a current abuser of alcohol; J.G. had previously been a dependent of the court due to the parents' substance abuse issues; and mother had failed to provide the child with adequate nutrition. At the detention hearing, the juvenile court ordered J.G. detained in shelter care.

On November 10, 2011, DCFS filed an amended petition adding the allegation that J.G. was medically examined and diagnosed with "Failure to Thrive."

At the adjudication and disposition hearing on January 9, 2012, the juvenile court sustained the allegations pursuant to section 300, subdivision (b) regarding the parents' drug history and current abuse, and J.G.'s exposure to illegal drugs and drug paraphernalia. The parents were granted monitored visits. Mother was ordered to participate in an inpatient drug treatment program, random on-demand drug testing, parenting classes, and individual counseling.

Beginning in April 2012, mother had day-long monitored visits with J.G. on Sundays. J.G. also had day-long visits with father on Saturdays, and all-day visits with

---

[1] Further statutory references are to the Welfare and Institutions Code.

2

his maternal grandmother one Saturday a month. The foster parent reported that J.G. started exhibiting angry behaviors after these family visits. Apparently the tension and discord in the family relationships was negatively affecting the child. He would shut down and be angry and aggressive toward others and sometimes soil his pants, which his therapist opined may have been an indication he was feeling out of control. The social worker recommended that J.G. receive therapy, and have shorter visits with his family members.

During the reunification period, mother completed a five-month inpatient drug program during which all of her drug tests were negative, and completed classes in substance abuse, relapse prevention, anger management and chemical dependence education. She also received individual counseling, engaged in outside community 12-step meetings, and enrolled in an outpatient program. Mother continued to test negative on her drug tests through July, August and September of 2012. Her counselor remarked that mother "appears to have a willingness and commitment to maintain abstinence from substances . . . . [She] has made a commitment to comply with her treatment program requirements and voices a strong desire to continue building a life in a sober environment." She was expected to complete the program in November 2012.

A contested six-month review hearing was concluded on November 7, 2012. The juvenile court found that mother had regularly and consistently visited and had contact with J.G., and had made significant progress in resolving the problems that led to J.G.'s removal. The court ordered continued reunification services, including unmonitored visits on the condition that mother continue to test clean, attend AA meetings three times per week, continue in counseling and not allow her ex-boyfriend Dan to have contact with J.G..

In December 2012, DCFS filed a section 388 petition, asking the juvenile court to modify its November 7, 2012 visitation order because Dan was living with mother and there was no way to ensure that Dan had no contact with J.G. As a consequence of this petition, the parties agreed to a visitation plan, signed by all counsel, which provided that mother's unmonitored visits be held at a place other than her home.

3

In February 2013, DCFS reported that mother had skipped drug tests on nine occasions between October 2012 and January 2013; she had tested negative once in December and again in January. Mother continued to attend 12-step meetings. Also in February 2013, the paternal grandparents, who lived in Louisiana, expressed an interest in adopting J.G. if he were not reunified with father.

In April 2013, J.G. was still in foster care. He had gone to Louisiana for three weeks with father, who was getting married there. While in Louisiana, J.G. connected with his paternal grandparents.

By April 2013, mother's relationship with the social worker had deteriorated; she had contacted the social worker's superiors and the Los Angeles County Board of Supervisors to complain. Mother stated that she was no longer going to drug test. Although mother continued to attend AA meetings, she had stopped seeing her psychiatrist in October 2012.

J.G. was seen twice weekly by his therapist because he continued to have tantrums. He reported to his therapist, foster parents, and the social worker that he wanted to live with father.

On April 4, 2013, mother tested positive for methamphetamine. Also on that day, mother's visitation with J.G. was cancelled due to her erratic behavior.

In June 2013, DCFS reported that mother had partially complied with court orders, but that she had a recent positive drug test and ongoing noncompliance with further drug tests, and thus remained at risk of relapse. J.G. continued to receive twice-weekly therapy, where he expressed his disappointment at mother's missed visits and broken promises. The child's therapist believed that mother's behavior was negatively affecting J.G., and recommended that mother's visits be changed to monitored.

The juvenile court conducted a section 366.22 review hearing on July 24, 2013. At this time, the court terminated mother's reunification services and ordered J.G. placed with the paternal grandparents, who had an approved homestudy, in Louisiana. On August 7, 2013, J.G. flew to Louisiana to live with the paternal grandparents.

4

In August 2013, mother stated that she had been in an abusive relationship with someone who would not leave her alone and had caused her bruising. She had not taken her psychotropic medication for three months, and was having a hard time emotionally. Mother had doubts about her ability to cope with J.G. being so far away, and planned to move to Louisiana. She visited J.G. in Louisiana three times in November and December 2013.

In its January 27, 2014 section 366.26 report, DCFS stated that J.G. was living with his paternal grandparents, the prospective adoptive parents, in Louisiana. J.G. no longer met the criteria for "Failure to Thrive." He was enrolled in the first grade in the local elementary school where he received "above average grades" and, according to his teacher, "is a good student who tries very hard at everything he does."

On January 27, 2014, the section 366.26 hearing was set for contest and continued to March 17, 2014. The hearing was again continued, to May 29, 2014, to permit mother's newly appointed counsel to prepare for the contest.

On May 10, 2014, mother was arrested for being under the influence of a controlled substance.

The section 366.26 hearing was continued two more times, on May 29 and June 26, 2014, at mother's request.

In June 2014, J.G.'s therapist reported that J.G. had adjusted positively in his new home environment and at school, where he was performing well above average. His therapist reported that the paternal grandparents facilitated visits between J.G. and father, which had strengthened that relationship, but that he was unwilling to discuss visits with his mother.

The section 366.26 hearing was ultimately held on August 15, 2014, at which time mother failed to appear for the contested hearing. At that time, mother's counsel argued against termination of mother's parental rights, stating "this would be detrimental to her son."

The juvenile court found by clear and convincing evidence that J.G. was adoptable, and that no exception to adoption applied. With respect to the beneficial

relationship exception to adoption, the court noted that J.G. was now seven, and "doesn't really even want to have any contact with [mother] at all. And she has slowly but surely seen him less and less and less." The court terminated parental rights and designated the paternal grandparents as the prospective adoptive parents.

Mother timely appealed the termination of her parental rights, claiming that the court erred in finding that the beneficial relationship exception to adoption found in section 366.26, subdivision (c)(1)(B)(i) does not apply to this case.

DISCUSSION

The substantial evidence standard of review applies to the juvenile court's ruling on the beneficial relationship exception to adoption. (*In re Autumn H.* (1994) 27 Cal.App.4th 567; see also *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.) When the sufficiency of the evidence to support a juvenile court's finding or order is challenged on appeal, the reviewing court must determine if there is substantial evidence, contradicted or uncontradicted, that supports it. (*In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1393.) "If there is any substantial evidence to support the findings of the juvenile court, a reviewing court must uphold the trial court's findings. All reasonable inferences must be drawn in support of the findings and the record must be viewed in the light most favorable to the juvenile court's order. [Citation.]" (*In re Jeannette S.* (1979) 94 Cal.App.3d 52, 58.) As stated by one court, "[i]n reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court. [Citation.]" (*In re Heather A*. (1996) 52 Cal.App.4th 183, 193.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S*. (1988) 201 Ca1.App.3d 315, 321.)

For the exception to apply, the parent must have maintained regular visitation with the child, and the juvenile court must determine that the parent/child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*In re Autumn H.*, *supra*, 27 Cal.App.4th 567, 575.) A parent must establish more than merely some benefit to the child by continuing the parent/child relationship. That relationship must be "a substantial, positive emotional attachment such that the child would be greatly harmed" if the relationship were severed. (*Ibid.*) To overcome the benefits associated with a stable, adoptive family, the parent seeking to continue a relationship with the child must prove that severing the relationship will cause not merely some harm, but great harm to the child. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853.)

Section 366.26, subdivision (c)(1)(B)(i), does not define the type of parent-child relationship that will trigger the exception. However, courts have required more than just "frequent and loving contact" to establish the requisite benefit for this exception. (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534.) Mother was required to show that her relationship with J.G. contributed to his well-being "to such a degree as to outweigh the well-being the child would gain in a permanent home." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) "Interaction between natural parent and child will always confer some incidental benefit to the child. . . . The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Ibid.*) In other words, "If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

7

The juvenile court found that the termination of the mother/child relationship in the present case would not be detrimental to the child because mother occupied the role of a friendly visitor, not a parental figure. From the time this dependency proceeding commenced in 2011, mother did not assume a meaningful, significant parental role in J.G.'s life. J.G. was indifferent to having telephone contact with mother. When he was in California, he said that he did not want to talk to mother, and he would quickly end their conversations. After he moved into the paternal grandparents' home in August 2013, he would often refuse to speak to mother. Earlier in the dependency case, J.G. said that he would like to live with father or stay with his former foster parents, and later said that he wanted to stay with his grandparents. He never stated that he wanted to live with mother; rather, he was adamant that he did not want to.

The Department also points out that after mother's visits, J.G.'s behavior would regress. He had explosive temper tantrums, which included threats to the foster parents and other children in the home, and even threats to kill the dog. J.G. would also trash his room, break glasses and soil his pants. J.G. did not behave in a similar manner after visits with his father. And when J.G. moved to Louisiana, these behaviors subsided.

In mother's reply brief, her counsel argues that the fact that J.G. had tantrums and soiled his pants after visits with mother is evidence of the very strong bond the two shared. "Rather than exhibiting a 'harmful' relationship between [mother] and J.G., J.G.'s anxious behaviors demonstrated his extreme and inarticulable frustration at being separated from mother—to whom he was strongly bonded." Mother concludes that "[t]hese behaviors evince the emotional detriment J.G. would suffer should he be permanently separated from his mother." However, "[i]t is axiomatic that the arguments of counsel are not evidence." (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 855, 895, fn. 9.) And mother presented no evidence to the juvenile court to support her contention that J.G. would suffer great detriment if he no longer had to deal with his extreme anxiety after having visits with his mother.

8

In short, the record is devoid of evidence that J.G. would suffer a detriment if mother's parental rights were terminated.  We therefore conclude that the juvenile court did not err in finding that no exceptional situation existed to forego the statutorily-mandated preference for adoption, and in terminating mother's parental rights.

DISPOSITION

The challenged rulings of the trial court are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


GOODMAN, J.[*]


We concur:



TURNER,  P. J.



MOSK, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.