Filed 8/18/25  LQ Investments v. Kim CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| LQ INVESTMENTS, L.P., | |
| Plaintiff and Appellant, | G063875 |
| v. | (Super. Ct. No. CVRI2105021) |
| JOOYOUN KIM et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Riverside County, Eric A. Keen, Judge. Reversed and remanded with instructions

Liner, Freedman Taitelman + Cooley, Bryan J. Freedman and Steven E. Formaker for Plaintiff and Appellant.

John L. Dodd & Associates and John L. Dodd; Law Offices of J. Stanley Demaree and J. Stanley Demaree for Defendants and Respondents.

\*       \*       \*

This action involves a complaint for unpaid rent on a commercial lease. Plaintiff LQ Investments (LQ) leased space in a shopping center to defendants Jooyoun and Heanam Grace Kim (the Kims), husband and wife, for the operation of a dry-cleaning business. Starting in 2018, the Kims began paying less rent. Eventually, in August 2021, the Kims terminated the lease and moved out. By this time, according to LQ, the Kims owed approximately $200,000 dollars in back rent. LQ sued to recover the rent.

Following a bench trial, the trial court found the Kims had breached the lease, and there was never any agreement by LQ to accept a lower lease payment. Nevertheless, it awarded zero dollars and entered judgment for the Kims on the ground that LQ had failed to mitigate its damages. The trial court reasoned that LQ should have evicted the Kims much sooner, which would have avoided the large buildup of back rent.

We reverse for two reasons.

First, LQ had no duty to evict the Kims so long as the Kims remained in possession and affirmed the contract. Under the lease, LQ was entitled to collect partial rent payments without prejudice to their ability to seek the full amount owed. For the entirety of the relevant time period, the Kims were masters of their own destiny: they were in a month-to-month lease and could have moved out at any time. Instead, they continued under the lease and, consequently, owe what is due under it.

Second, as a factual matter, there was simply no evidence that LQ could have avoided any damages by evicting the Kims. The evidence at trial indicated the shopping center had excessive vacancies, and the rent called for by the lease was above market value. There was no evidence that LQ could have replaced the Kims with any tenant, much less one that could pay more than what the Kims were paying.

FACTS

Plaintiff LQ Investments, LLC is a commercial landlord that leased space to defendants Jooyoun and Heanam Kim for use as a dry-cleaning business called Mint Cleaners. The original lease was executed on May 2, 1996, and had a ten-year term with one ten-year option to extend. In 2007, the parties executed a First Amendment to the lease, retroactively extending the term through July 31, 2016. The lease provided that if the tenants held over with the landlord's consent, the tenancy would convert to month-to-month at 150 percent of the most recent rent, but otherwise under the same lease terms.

During the second term, the Kims fell into periodic arrears. In July and November 2015, LQ served the Kims with two Three-Day Notices to Pay Rent or Quit. By July 2016—just as the extended term expired—the rent ledger showed the Kims in arrears by more than $12,500. Despite the expiration of the lease term on July 31, 2016, the Kims continued to occupy the premises and operate their business. We refer to the period after the expiration of the lease as the holdover period.

Around this time, the anchor tenant at the shopping center, a grocery store, moved out. According to the Kims, "the shopping center became dead." As a result, the Kims sought a rent reduction. However, the trial court ultimately found that LQ never consented to the reduced rent.

Throughout the holdover period, despite that LQ invoiced rent and CAM charges consistent with the lease, the Kims unilaterally paid a lower amount each month. From August 2016 onward, they regularly remitted just $5,969.89 per month—well below the amount due under the

3

lease.[1] LQ continued to invoice the full amount of rent. The record contains one invoice from late 2018 and one invoice from late 2019 informing the Kims that the total rent due was $8,107.24, plus a fee for maintenance, insurance, and tax. Beginning in 2020, amid the COVID-19 pandemic, the Kims' payments dropped further, at times falling below $3,000.

In March 2020, LQ's leasing agent wrote to the Kims asking them to address their "large balance due" by filling out various reports on the Kims' earnings.[2] In October 2020, the leasing agent sent a letter to the Kims noting they owed roughly $125,000, and stating, "In order for your business to continue operating at La Quinta Village, you must provide us with a proposal to repay the outstanding balance on your account and discuss terms moving forward." By mid-2021, the Kims' cumulative underpayments (post May 2018) totaled nearly $200,000. Although the record shows LQ accepted partial payments throughout this period without further formal notices to quit, it continued invoicing full rent monthly and never modified the lease terms in writing.

The Kims vacated the premises at the end of July 2021. However, they did not return the keys to LQ or its property manager. Ms. Kim testified that they left the keys in the store, but LQ's leasing agent testified they never received any keys and were unable to access the premises. On October 21,

---

[1] Although the lease called for holdover rent at 150% of the prior base amount, the trial court found that LQ never exercised the 150% provision during the holdover period.

[2] In May 2018, LQ's rent ledger was inadvertently reset to reflect a zero balance for the Kims. Although the cause of the reset was not clearly explained, LQ later agreed that it would not seek recovery for unpaid amounts incurred prior to that date. All of the amounts sought in this lawsuit post-dated May 2018.

2021, LQ rekeyed the unit and resumed control. LQ immediately began showing the unit to a potential tenant. However, they were not successful in finding a tenant. Following the rekeying, LQ engaged a commercial broker, but as of the time of trial (March 2023), they had not secured a new tenant.

On November 3, 2021, LQ filed suit for breach of lease and account stated. In their answer, the Kims generally denied the allegations of the complaint and asserted several affirmative defenses, but did not include a failure to mitigate damages defense among them. The Kims raised failure to mitigate for the first time in the parties' joint trial readiness conference statement. In its trial brief, LQ argued that the mitigation defense had been waived because it was not pleaded in the answer and had not been raised until the eve of trial.

The matter proceeded as a bench trial over two days in March 2023. The word "mitigate" (or any derivative) was not mentioned during the trial. LQ's argument was straightforward: the Kims underpaid and thus owed money under the lease. The Kims' argument was that the parties had informally agreed to a lower rent. The Kims argued that LQ did this because the shopping center had lost an anchor tenant, and the Kims' premises was no longer worth the rent specified in the lease. The Kims also argued that LQ forfeited the right to obtain the full lease payment by failing to object when the Kims paid a lower amount, citing Code of Civil Procedure section 2076.

The court issued a written ruling on March 29, 2023. The court specifically found that "there was no agreement by [LQ] to accept [reduced rent] in lieu of the monthly rent set by [LQ] at the beginning of each year." However, it denied LQ's claims in their entirety based on a finding that LQ had failed to mitigate its damages. The court reasoned that because LQ allowed the Kims to remain on the premises for years while regularly

underpaying rent, and never took steps to evict them, it had failed to act reasonably to avoid further losses. The court characterized this prolonged inaction as a failure to mitigate and, notwithstanding a finding that the Kims were in breach of the lease, awarded LQ $0.

LQ requested a statement of decision following the ruling, but the court did not issue one.

LQ timely appealed the judgment.

DISCUSSION

LQ contends the court erred by imposing a duty to evict the Kims under the doctrine of mitigation of damages. In general, whether a party mitigated their damages is a question of fact that we review for substantial evidence. (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal. App. 4th 835, 875.) However, where the issue is whether the defense of mitigation was available as a matter of law, our review is de novo. (*Gajanan Inc. v. City and County of San Francisco* (2022) 77 Cal.App.5th 780, 791-92.) We agree the court erred, both legally and factually.[3]

"As a general rule, a party cannot recover damages for loss that he could have avoided by reasonable efforts." (Restatement (Second) of Contracts § 350, cmt. b (1981).) However, the defense of mitigation applies only to the portion of damages the injured party "could have avoided without undue risk". (Restatement (Second) of Contracts § 350(1) (1981); see *Carnation Co. v. Olivet Egg Ranch* (1986) 189 Cal.App.3d 809, 818-819, fn.

---

[3] LQ also contends the court erred by relying on an unpleaded affirmative defense and by failing to issue a statement of decision. Because we agree with LQ on the merits, we decline to address these procedural issues.

12.) "The rule of mitigation of damages has no application where its effect would be to require the innocent party to sacrifice and surrender important and valuable rights." (*Valle de Oro Bank v. Gamboa* (1994) 26 Cal.App.4th 1686, 1691.) Moreover, mitigation is an affirmative defense, and, as such, the burden of proof is on the breaching party to prove that damages could have been avoided by reasonable efforts. (*Polster, Inc. v. Swing* (1985) 164 Cal.App.3d 427, 433 ["the burden is on the lessee to prove that the lessor failed to mitigate"]; Civil Code, § 1951.2, subd. (a)(2) [placing the burden on the lessee to prove avoidable damages].)

Here, the trial court based its finding on the fact that, from 2016 through 2021, LQ made no attempt to evict the Kims, who were consistently paying less than the full amount of rent. Despite finding that the Kims were in breach of the lease, the court awarded no damages, implying that LQ could have avoided all of its damages by evicting the Kims.

The court erred in two ways.

First, as a legal matter, LQ was under no duty to evict the Kims. What the trial court's ruling did, essentially, was to require LQ to treat a partial breach as a total repudiation and termination of the contract even though the Kims never actually repudiated the contract. But that is contrary to the law and the lease agreement itself.

Under section 317 of the Restatement (First) of Contracts, an injured party may treat a material breach as partial so long as the other party has not repudiated the contract and assents to its continuation. California follows this principle. (*Coughlin v. Blair* (1953) 41 Cal.2d 587, 598–599 ["even if a breach is total, the injured party may treat it as partial, unless the wrongdoer has repudiated the contract."]; *B. C. Richter Contracting Co. v. Continental Cas. Co.* (1964) 230 Cal.App.2d 491, 500

7

["Where his performance is not prevented, the injured party may elect instead to affirm the contract and complete performance."].) Here, the Kims did not repudiate. They remained in possession on a month-to-month basis under the holdover provision and continued operating under the lease.

The principal that a landlord is under no duty to evict a tenant who affirms the contract is reflected in Civil Code section 1951.2, which applies when a tenant abandons a lease. Although that did not happen here—the Kims continued to operate under the written lease—the structure of section 1951.2 provides some insight. It states that upon termination of the lease, "the lessor may recover from the lessee: [¶] (1) The worth at the time of award of the unpaid rent which had been earned at the time of termination; [¶] (2) The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the lessee proves could have been reasonably avoided . . . ." Notice that the "reasonably avoided" damages limitation (i.e. mitigation) only applies to the unpaid rent that would have been paid *after* termination of the lease. There is no similar limitation on rent that had accrued prior to termination. The implication is that when the lease remains in force, as it did here, the landlord may accept partial payments without triggering a duty to mitigate.

Finally, the parties' lease confirmed this arrangement. The lease provided that if the Kims breached the lease by failing to pay the full rent, "Tenant shall be deemed to be in material breach of this Lease, and Owner with or without further notice of demand my either: [¶] (a) Terminate Tenant's right to possession of the premises because of such breach, and recover from Tenant all damages allowed under Section 1951.2 of the California Civil Code . . .; or, [¶] (b) Not terminate Tenant's right to

8

possession because of such breach, but continue this Lease in full force and effect . . . ." Directly relevant here, the lease states elsewhere: "No payment by Tenant or receipt by Owner of a lesser amount than the rent herein stipulated shall be deemed to be . . . an accord and satisfaction, and Owner may accept such check or payment without prejudice to Owner's right to recover the balance of such rent or pursue any other remedy in this Lease . . . ." Accordingly, the agreement between the parties clearly contemplated that LQ was entitled to collect partial rent without terminating the lease and without waiving its right to collect the full amount due under the lease. In finding LQ had a duty to do otherwise, the court's ruling contravened general contract law and the specific terms of the contract between the parties.

Second, as a factual matter, there is no evidence in the record to support a finding that LQ could have eliminated its damages by evicting the Kims. As we previously noted, mitigation was not mentioned at all in the trial—either during the presentation of evidence or during argument. Unsurprisingly, therefore, no party presented evidence of potential replacement tenants, alternative rent amounts, or market conditions indicating LQ could have relet the premises at a comparable rate.

What evidence does exist suggests the opposite. The Kims began paying reduced rent after the shopping center lost its anchor tenant, leading to decreased foot traffic. They testified that the lease rate was above market value. By 2021, half of the shopping center was vacant. The Kims' former unit remained vacant at the time of trial. On this record, there is no support for the inference that LQ could have relet the premises, much less at the rental rate provided in the lease. To the contrary, had LQ evicted the Kims as the trial court suggested, that likely would have compounded LQ's losses, which LQ was not required to do. Accordingly, substantial evidence does not

9

support the trial court's conclusion that LQ failed to mitigate its damages by failing to evict the Kims.

## CONCLUSION

The lesson to be drawn from this case is that contracts matter. Under the circumstances, the Kims should have renegotiated their lease rather than assuming that their unilateral payment reductions altered the contract. They were month-to-month tenants, and if the rent was truly above market value as they contend, they had leverage to seek more favorable terms. Indeed, the Kims' principal position at trial was that they *had*, in fact, renegotiated the rent. But there is no written amendment to support that position, and the trial court made a factual finding that there was no agreement between the Kims and LQ to reduce the rent. In light of that factual finding, the ineluctable result is that the Kims owed the full amount called for under the written lease so long as the lease was in effect.

On remand, the court must enter judgment in favor of LQ for the full amount due under the lease. The exact amount is subject to some dispute because the Kims moved out in August 2021, but, according to LQ, they failed to return the keys and thus LQ was not able to take possession until October 2021. The court did not make any factual findings or legal conclusions about that time period, which affects the amount of damages due to LQ. The court may resolve that issue on remand by either holding an additional evidentiary hearing or relying on the evidence presented at trial.

## DISPOSITION

The judgment is reversed. On remand, the trial court shall enter judgment in favor of LQ for the full amount of rent due under the parties' written lease from May 2018 onward, excluding any amounts based on the 150 percent holdover rate. LQ shall recover its costs incurred on appeal.


SANCHEZ, J.

WE CONCUR:


MOORE, ACTING P. J.


SCOTT, J.